**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CLEAN WATER ACTION
1444 I Street NW, Suite 400
Washington, DC 20005,

ENVIRONMENTAL INTEGRITY
PROJECT
1000 Vermont Avenue NW, Suite 1100
Washington, DC 20005,

SIERRA CLUB
2101 Webster Street, Suite 1300
Oakland, CA 94612,

WATERKEEPER ALLIANCE, INC.
180 Maiden Lane, Suite 603
New York, NY 10038,

PENNENVIRONMENT, INC.
1429 Walnut Street, Suite 1100
Philadelphia, PA 19102,

CHESAPEAKE CLIMATE ACTION
NETWORK
6930 Carroll Avenue, Suite 720
Takoma Park, MD 20912,

PHYSICIANS FOR SOCIAL
RESPONSIBILITY, CHESAPEAKE,
INC.
325 East 25th Street
Baltimore, MD 21218,

and

PRAIRIE RIVERS NETWORK
1902 Fox Drive, Suite G
Champaign, IL 61820

        Plaintiffs,

    v.

Civil Action No. ___17-817_____

1

E. SCOTT PRUITT,
ADMINISTRATOR, U.S.
ENVIRONMENTAL PROTECTION
AGENCY, in his official capacity
William Jefferson Clinton Building
1200 Pennsylvania Avenue, NW
Washington, DC 20460

and

U.S. ENVIRONMENTAL
PROTECTION AGENCY
William Jefferson Clinton Building
1200 Pennsylvania Avenue, NW
Washington, DC 20460

                    Defendants.

# COMPLAINT

## INTRODUCTION

1.      Plaintiffs Clean Water Action, Environmental Integrity Project ("EIP"), Sierra

Club, Waterkeeper Alliance, Inc., PennEnvironment, Inc., Chesapeake Climate Action Network

("CCAN"), Physicians for Social Responsibility, Chesapeake, Inc. ("Chesapeake PSR"), and

Prairie Rivers Network ("PRN") (collectively "Plaintiffs") assert violations of the Administrative

Procedure Act ("APA") by defendants E. Scott Pruitt, Administrator of the United States

Environmental Protection Agency, and the United States Environmental Protection Agency

(collectively "EPA"), for EPA's April 25, 2017 notice purporting to indefinitely stay certain

compliance deadlines in EPA's November 2015 final rule revising the Clean Water Act Effluent

Limitation Guidelines for power plants (the "ELG rule").  *See* Postponement of Certain

Compliance Dates for Effluent Limitations Guidelines and Standards for the Steam Electric

Power Generating Point Source Category, 82 Fed. Reg. 19,005 (Apr. 25, 2017) ("Indefinite

Stay").  A copy of the Indefinite Stay notice is attached hereto as Exhibit A.

2.      The ELG rule had been finalized by EPA after a lengthy rulemaking process.  80

Fed. Reg. 67,838 (Nov. 3, 2015).  The effective date of the rule was January 4, 2016—nearly

sixteen months ago.

3.      Power plants are by far the largest source of toxic water pollution in the country,

and the ELG rule requires power plants to meet new limits on pollutants in their wastewater

effluent that are based on EPA's technical findings as to the level of pollution reduction

achievable using the best available wastewater treatment technology that is affordable to the

industry.

4.      On April 25, 2017, however, without notice and without providing the public with

an opportunity to comment, EPA promulgated the Indefinite Stay, which purports to postpone

indefinitely Clean Water Act compliance deadlines for power plants established in the ELG rule.

5.      EPA's Indefinite Stay violates the APA for at least six reasons:

   a.   First, EPA failed to make the findings required to support a determination that

        "justice so requires" an administrative stay under 5 U.S.C. § 705, which (as this

        Court has held) are equivalent to the four-part test that courts must apply when

        determining whether a preliminary injunction is appropriate.  *See Sierra Club v.*

        *Jackson*, 833 F. Supp. 2d 11, 30 (D.D.C. 2012).  EPA's Indefinite Stay notice

        does not even mention the four-part preliminary injunction test, much less make

        any of the findings that would be necessary to support an administrative stay of

        the ELG rule.

b.  Second, the Indefinite Stay is unlawful, because EPA's professed justification for the stay was to consider pending petitions for reconsideration, rather than to stay the rule pending judicial review.  In fact, contemporaneously with issuing the Indefinite Stay, EPA sought and was granted an abeyance of judicial review in the U.S. Court of Appeals for the Fifth Circuit.

c.  Third, the Indefinite Stay is unlawful because 5 U.S.C. § 705 provides only for "postpon[ing] the effective date" of an action, and the effective date of the ELG rule is nearly sixteen months in the past.

d.  Fourth, the Indefinite Stay is unlawful because EPA postponed the compliance dates for only selected portions of the ELG rule, rather than staying the effectiveness of the rule in its entirety.  This is contrary to the plain language of Section 705, which only authorizes agencies to "postpone the effective date" of rules in their entirety.  It is also arbitrary and capricious, because EPA's action only postpones compliance dates for new, more stringent effluent limitations in the ELG rule, while leaving in effect other provisions of the rule, such as exemptions from more stringent effluent limitations for so-called "legacy wastewater" and leachate.  EPA did not provide any reasoned explanation in the Indefinte Stay notice as to why the regulatory status quo that existed prior to the promulgation of the ELG rule should be maintained only for some portions of the ELG rule but not others.

e.  Fifth, the Indefinite Stay is unlawful because EPA did not provide an adequate justification for the stay or consider all relevant factors.  EPA considered only the costs of the rule, and arbitrarily failed to consider the significant benefits of

preventing more than 1.4 billion pounds of toxic mercury, arsenic, lead, and other pollutants from being dumped in our nation's waterways every year.

  f. Sixth, the Indefinite Stay is unlawful because EPA failed to provide prior notice and an opportunity to comment, as required by 5 U.S.C. § 553, despite the fact that by indefinitely postponing certain compliances deadlines in the ELG rule, the Indefinite Stay is a final action with binding legal effect.

6. Plaintiffs request that the court hold that EPA's Indefinite Stay of the ELG rule is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" in violation of the APA, 5 U.S.C. § 706(2)(A), and vacate the Indefinite Stay.

## JURISDICTION & VENUE

7. This Court has jurisdiction under the federal question statute, 28 U.S.C. § 1331, and may issue a declaratory judgment under 28 U.S.C. § 2201(a) and grant further relief under 28 U.S.C. § 2202.  Plaintiffs have a right to bring this action under the APA, 5 U.S.C. §§ 701–06, which provides for judicial review of final agency actions for which there is no other adequate remedy in a court.

8. Venue is proper in this Court because Defendants reside in this district, the Indefinite Stay giving rise to this lawsuit was issued in this district, and one of the Plaintiff organizations, EIP, resides in this district.  *See* 28 U.S.C. § 1391(e)(1).

## PARTIES

9. Plaintiffs are non-profit conservation, environmental, and public health advocacy organizations with longstanding interests in improving water quality across the nation, and a particular interest in advocating for control of water pollution from large sources such as power plants, due to their significant impacts on public health and the environment.

10.     Clean Water Action is a national, non-profit membership organization incorporated under the laws of the District of Columbia, and has more than 800,000 members nationwide.  Clean Water Action's mission includes the prevention of pollution in the nation's waters, protection of natural resources, creation of environmentally-safe jobs and businesses, and empowerment of people to make democracy work.

11.     EIP is a non-profit organization based in Washington, D.C.  EIP's objectives are to provide objective analysis of how the failure to enforce or implement environmental laws increases pollution and affects the public's health, to hold federal and state agencies, as well as individual corporations, accountable for failing to enforce or comply with environmental laws, and to help local communities in key states obtain the protection of environmental laws.

12.     Sierra Club is a non-profit corporation incorporated in San Francisco, California, with more than 744,000 members nationwide.  Sierra Club is dedicated to exploring, enjoying, and protecting the wild places of the Earth; to practicing and promoting responsible use of the Earth's resources and ecosystem; and to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to use all lawful means to carry out those objectives.

13.     Waterkeeper Alliance, Inc. is a non-profit headquartered in New York, New York uniting more than 300 Waterkeeper Organizations and Affiliates around the world and focusing citizen advocacy on issues that affect our waterways and water quality. Within the United States, Waterkeeper Alliance, Inc. works with 165 Waterkeeper Organizations and Affiliates to create and preserve drinkable, fishable, swimmable, and clean waterways.

14.     PennEnvironment, Inc. is a non-profit environmental advocacy group that is actively engaged in education, research, lobbying, litigation, and citizen organizing to encourage

conservation and environmental protections in Pennsylvania.  PennEnvironment, Inc. has worked

to reduce toxic pollution in Pennsylvania waterways and educate the public about the dangers of

mercury and other toxic pollutants through its reports and grassroots outreach on behalf of its

tens of thousands of members.

15.     CCAN is a grassroots, non-profit organization founded to transition the region

towards clean-energy solutions to climate change, specifically in Maryland, Virginia, and

Washington, D.C.  CCAN's mission is to educate and mobilize citizens in a way that fosters a

rapid societal switch to clean energy sources.  This mission includes ensuring that facilities that

contribute to global warming, such as coal-fired power plants, do not impact the health of

CCAN's members or the environment through the release of dangerous pollutants.

16.     Chesapeake PSR is a non-profit organization dedicated to creating a healthy, just,

and peaceful world for both present and future generations.  On behalf of its approximately 300

members, Chesapeake PSR uses its medical and public-health expertise to engage in regulatory

and permitting processes to promote clean, renewable energy and to minimize the amount of

toxic pollution released from coal-fired power plants.

17.     PRN is an Illinois non-profit organization that champions clean, healthy rivers

and lakes and safe drinking water to benefit the people and wildlife of Illinois.  Drawing upon

sound science and working cooperatively with others, PRN advocates public policies and

cultural values that sustain the ecological health and biological diversity of water resources and

aquatic ecosystems.

18.     Plaintiffs bring this action on their own behalf and on behalf of their members.

Plaintiffs and their members have been and will continue to be injured by EPA's Indefinite Stay

of the ELG rule.  Plaintiffs' members are injured because they use and enjoy waters throughout

the United States that receive discharges of pollution from power plants.  EPA's Indefinite Stay

of the ELG rule impairs Plaintiffs' members' use and enjoyment of those waters, causing them to

curtail activities they would otherwise enjoy, derive less enjoyment or benefit from other

activities, and suffer reasonable concerns and anxiety about the potential for future harm.

Plaintiffs are also harmed because their organizations have a long history of involvement in (and

investment of institutional resources in) exercising their legal rights to engage in advocacy for

more protective power plant Clean Water Act permits, for enforcement of those permits, and for

development and implementation of the ELG rule itself.  In fact, EPA only issued the ELG rule

in 2015 in response to several of Plaintiffs and another partner organization taking the Agency to

court and securing an order requiring it to review and revise the power plant ELGs.  *See*

*Defenders of Wildlife v. Jackson*, No. 1:10-cv-01915-RWR (D.D.C. filed Nov. 8, 2010).

Plaintiffs' injuries are actual, concrete and irreparable.  They cannot be redressed by money

damages.  The requested relief will redress these injuries.

19.     Defendant E. Scott Pruitt is the Administrator of the United States Environmental

Protection Agency.  He is sued in his official capacity only.

20.     Defendant United States Environmental Protection Agency is an agency of the

federal government.

## STATUTORY FRAMEWORK

## CLEAN WATER ACT

21.     The Clean Water Act is the principal federal statute enacted to protect the quality

of the waters of the United States.  The Clean Water Act's goals are "to restore and maintain the

chemical, physical, and biological integrity of," and to "eliminate[]" "the discharge of pollutants

into," the waters of the United States.  33 U.S.C. § 1251(a), (a)(1).

22.     A central mechanism within the Clean Water Act to advance these goals is the requirement that polluting facilities meet a series of increasingly stringent limitations on the pollutants in their wastewater effluent, based on the pollution reduction achievable through use of technology to treat or eliminate wastewater discharges.  *Natural Res. Def. Council, Inc. v. EPA*, 859 F.2d 156, 202 (D.C. Cir. 1988).

23.     For pollutants the Clean Water Act classifies as either toxic (such as heavy metals) or "nonconventional" (such as nitrogen), the first effluent limitations that sources were required to meet were "best practicable control technology," which Congress intended to apply to all pollutant dischargers by 1977, 33 U.S.C. § 1311(b)(1)(A), followed by the more stringent "best available technology economically achievable" ("BAT"), which Congress intended to apply to all pollutant dischargers by 1989, *id.* § 1311(b)(2).  The statute requires EPA to promulgate these technology-based effluent limitations through rulemakings establishing effluent limitation guidelines, or ELGs, which are nationwide, minimum standards for different categories of sources.  *E.I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112, 127, 129 (1977).

24.     Section 301 of the Clean Water Act provides that "compliance with effluent limitations" based on BAT must be achieved "as expeditiously as practicable, but in no case later than three years after the date such limitations are promulgated under" the Act.  33 U.S.C. § 1311(b)(2).

25.     Congress intended BAT to be "technology-forcing" and to "push[] industries toward the goal of zero discharge as quickly as possible."  *Kennecott v. EPA*, 780 F.2d 445, 448 (4th Cir. 1985).  BAT limits are supposed to "represent[] a commitment of the maximum resources economically possible to the ultimate goal of eliminating all polluting discharges."  *EPA v. Nat'l Crushed Stone Ass'n*, 449 U.S. 64, 74 (1980).

26.     EPA must review and revise as necessary the ELGs every year, 33 U.S.C. § 1314(b), and review and revise as necessary the effluent limitations every 5 years, *id.* § 1311(d).

27.     The Clean Water Act also requires EPA to establish (and periodically revise) pretreatment standards for "indirect dischargers" who send their wastewater offsite to publicly owned treatment works rather than discharging it directly.  *Id.* § 1317(b).  For toxic pollutants, these pretreatment standards must be no less stringent than the effluent limitations that would apply to the same wastewater if it were directly discharged.  *Id.* § 1317(b)(1).  The Clean Water Act provides that pretreatment standards "shall specify a time for compliance not to exceed three years from the date of promulgation."  *Id.*

### ADMINISTRATIVE PROCEDURE ACT

28.      Under the APA, "[w]hen an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review."  5 U.S.C. § 705.  Congress did not thereby intend to grant any new or additional authority to federal agencies; that portion of the statute was meant only as "a restatement of existing law."  Attorney General's Manual on the Administrative Procedure Act 93, at 105 (1947).

29.     Under 5 U.S.C. § 705, "the standard for a stay at the agency level is the same as the standard for a stay at the judicial level: each is governed by the four-part preliminary injunction test applied in this Circuit."  *Sierra Club v. Jackson*, 833 F. Supp. 2d at 30.

30.     The APA requires agencies to engage in a notice-and-comment process prior to formulating, amending, or repealing a rule.  5 U.S.C. §§ 551(5), 553.  This process is designed to "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments."  *Id.* § 553(c).

31.     The APA provides that "[t]he reviewing court shall . . . hold unlawful and set aside" agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law." *Id*. § 706(2).

## FACTS

32.     Power plants are by far the largest source of toxic water pollution in the United States.  When finalizing the ELG rule in 2015, EPA found that power plants generate more toxic wastewater than the next two-largest polluting industries combined.  EPA, *Environmental Assessment for the Effluent Limitations Guidelines and Standards for the Steam Electric Power Generating Point Source Category*, Doc. No. EPA-821-R-15-006, Dkt. ID No. EPA-HQ-OW-2009-0819-6427, at 3-15, Table 3-3 (Sept. 2015) ("Final Environmental Analysis").

33.     Power plant wastewater contains toxic metals such as mercury, arsenic, and selenium, as well as nonconventional pollutants such as nitrogen and dissolved solids that contaminate drinking water and harm ecosystems.  80 Fed. Reg. at 67,840–41.  "The pollutants discharged by [power plants] can cause severe health and environmental problems in the form of cancer and non-cancer risks in humans, lowered IQ among children, and deformities and reproductive harm in fish and wildlife."  *Id.* at 67,838.

34.     Power plants release this pollution near almost 100 public drinking water intakes and approximately 1,500 wells, and studies confirm that drinking water supplies are adversely affected by the pollution.  *Id.* at 67,840. Power plant pollution also contaminates fish that people eat—an impact that is borne disproportionately by minority and low-income communities.  *Id.*

35.     Water pollution from power plants makes over 4,000 miles of rivers unsafe for use as a source of drinking water or for fish, and makes over 6,000 miles of rivers unsafe for

children to use for recreational fishing.  Final Environmental Analysis at 7-35.  EPA estimates

that roughly 30 million people are exposed to fish contaminated by power plant wastewater,

including over 3 million young children exposed to lead and over 400,000 infants exposed to

mercury in utero.  EPA, *Benefit and Cost Analysis for the Effluent Limitations Guidelines and

Standards for the Steam Electric Power Generating Point Source Category*, Document No. EPA-

821-R-15-005, Dkt. ID No. EPA-HQ-OW-2009-0819-5856, at 3-4, 3-9, 3-16 (Sept. 2015)

("Final Benefit and Cost Analysis").

 36. Despite statutory obligations to periodically review and revise ELGs and effluent

limitations, prior to issuing the final ELG rule in 2015, EPA had not updated the ELGs for power

plants since 1982.  *See* 47 Fed. Reg. 52,290 (Nov. 19, 1982).  EPA has admitted that the 1982

ELG rule is "out of date."  80 Fed. Reg. at 67,840.  The 1982 guidelines did not set any specific

limits on the discharge of toxic metals in power plant wastewater.  *See id*. at 67,840–41.  In the

1982 rulemaking, EPA acknowledged that future revisions would be necessary, in particular to

address wastewaters from air pollution control systems, specifically flue gas desulfurization

systems (also known as "FGD" systems or "scrubbers").

 37. In the absence of nationwide best available technology limits on specific toxic

pollutants in power plant wastewater, it was left up to state and regional permitting agencies to

set limits on a case-by-case basis.  State permitting agencies largely failed to do so.  A 2013

report found that nearly 70 percent of power plant permits (188 out of 274) set no specific limits

on discharges of toxic pollutants such as arsenic, lead, and mercury from these plants.  *See* EIP et

al., *Closing the Floodgates: How the Coal Industry is Poisoning Our Water and How We Can

Stop It*, at 7 (July 23, 2013), Dkt. ID No. EPA-HQ-OW-2009-0819-4714, Ex. 1.  Thus, in

practice, most power plants have for decades been able to dump significant amounts of toxic pollutants into rivers, lakes, and streams.

38.     In 2010, Defenders of Wildlife and Sierra Club (represented by EIP and Earthjustice) sued EPA in this Court for its failure to comply with Clean Water Act requirements that it review and revise the power plant ELGs.  *See Defenders of Wildlife v. Jackson*, No. 1:10-cv-01915-RWR (D.D.C.).  In March 2012, the Court approved a consent decree setting deadlines for EPA to issue a proposed and final rule.  With the consent of plaintiffs in that action, these deadlines were repeatedly extended to allow EPA further time to consider and develop the record.

39.     Over thirty years after EPA had last updated the power plant ELGs, EPA issued the ELG Rule in 2015.  80 Fed. Reg. at 67,838.

40.     The ELG rule's effective date was January 4, 2016.  *Id.*

41.     The ELG rule was the culmination of many years of rulemaking, during which EPA obtained detailed information from 733 power plants as well as pollution control vendors, conducted site visits to power plants, responded to thousands of comments, and produced an administrative record consisting of thousands of documents.  *See id.* at 67,844–46.

42.     Among other things, the ELG rule sets new, more stringent technology-based effluent limitations on the discharge of toxic metals in wastewater from power plants' FGD systems, and it prohibits the discharge of any water used to transport fly ash or bottom ash generated during the combustion process.  *Id.* at 67,841; 40 C.F.R. § 423.13(g)(1), (h)(1), (k)(1). For existing sources that directly discharge to waterways, the rule requires that each facility's Clean Water Act permitting agency establish a compliance date for the new effluent limitations that is as soon as possible after November 1, 2018, but in no case later than December 31, 2023. 80 Fed. Reg. at 67,854; 40 C.F.R. § 423.13(g)–(k).  For existing sources that indirectly discharge

by sending their wastewater to outside wastewater treatment facilities, the rule requires

compliance with new pretreatment standards by November 1, 2018.  40 C.F.R. § 423.16(e)–(i).

43.     The ELG rule exempts two components of power plant wastestreams from having

to meet new, more stringent effluent limitations: leachate from impoundments and landfills, and

so-called "legacy wastewater," which is wastewater that was generated and stored at a power

plant but not yet discharged as of the compliance date for the new effluent limitations.  The ELG

rule did not include an extended compliance timeframe for either of these exemptions, and so

both went into effect as of the rule's January 4, 2016 effective date.  *See* 40 C.F.R. §

423.13(g)(1)(ii) (legacy FGD wastewater), (h)(1)(ii) (legacy fly ash transport water), (i)(1)(ii)

(legacy flue gas mercury control wastewater), (j)(1)(ii) (legacy gasification wastewater), (k)(1)(ii)

(legacy bottom ash transport water), (*l*) (leachate).

44.     EPA's detailed analysis projected that the ELG rule would prevent 1.4 billion

pounds of pollution from entering the nation's waters every year.  *See* 80 Fed. Reg. at 67,840–41.

45.     After EPA issued the final ELG rule in 2015, several parties (including several

Plaintiff organizations) filed petitions for review.  The Panel on Multi-District Litigation selected

the Fifth Circuit as the circuit in which the cases should be heard, and all petitions have been

consolidated in the Fifth Circuit.  *See* Consolidation Order, *In re: EPA, Effluent Limitation

Guidelines*, MCP No. 136, ECF Doc. 3 (J.P.M.L. Dec. 8, 2015); Consolidation Order, *Sw. Elec.

Power Co. v. EPA*, No. 15-60821, ECF Doc. 00513301255 (5th Cir. Dec. 9, 2015).

46.     In the consolidated proceedings challenging the ELG rule, Petitioners filed their

opening briefs on December 5, 2016.

47.     On March 24, 2017, the Utility Water Act Group ("UWAG") filed a petition with

EPA requesting that the agency stay all deadlines in the rule and reconsider the rule.

48.     On April 5, 2017, the Advocacy Office of the U.S. Small Business Administration filed a petition with EPA requesting that the agency reconsider the rule.

49.     On April 12, 2017, EPA Administrator Scott Pruitt sent a letter to UWAG and the Small Business Administration stating that EPA intends to reconsider the final ELG rule.

50.     On April 14, EPA moved to hold the cases pending in the Fifth Circuit in abeyance for 120 days, so as to allow EPA time to evaluate the petitions for reconsideration.  On April 24, the Fifth Circuit granted EPA's motion and ordered that the cases be held in abeyance until August 12.  Order, *Sw. Elec. Power Co. v. EPA*, No. 15-60821, ECF Doc. 00513964356 (5th Cir. Apr. 24, 2017).

51.     On April 25, 2017, EPA published a notice purporting to stay indefinitely "the compliance deadlines for the new, more stringent limitations and standards" in the ELG rule.  82 Fed. Reg. at 19,005 (the Indefinite Stay).  EPA did not provide the public with notice or an opportunity to comment on this Indefinite Stay prior to publication, despite the immediate effect of this action to halt measures being taken to achieve compliance with the ELG rule.

52.     In the Indefinite Stay notice, EPA stated that it was "not making any concession of error with respect to the rulemaking," but rather was basing the Indefinite Stay on its desire to conduct a "careful and considerate review" of the issues presented in the reconsideration petitions.  *Id*. at 19,005.

53.     EPA also stated in the Indefinite Stay notice that it was making its decision to stay "the compliance deadlines for the new, more stringent limitations and standards" in the ELG rule "[i]n light of the capital expenditures that facilities incurring costs under the Rule will need to undertake in order to meet" those deadlines.  *Id*. at 19,005.  However, EPA failed to consider any

benefits of the ELG rule.  In particular, the Indefinite Stay notice does not mention any benefits

to public health and the environment from reducing these toxic wastewater discharges.

54.     The Indefinite Stay notice does not even mention the four-part test for a

preliminary injunction, let alone make any findings concerning the likelihood of success on the

merits of any of the legal challenges to the ELG rule, the balance of harms to the regulated

industry versus those who would benefit from the rule, or the public interest.

55.     By its own admission, EPA has applied the Indefinite Stay to only the new, more

stringent effluent limitations and standards in the ELG rule.  Other provisions of the ELG rule,

such as the legacy wastewater and leachate exemptions, are unaffected by the Indefinite Stay.

By allowing these exemptions to remain in place, EPA prevents states from making case-by-case

determinations as to what represents the appropriate effluent limits for leachate and legacy

wastewater, which could be more stringent than the limits in the ELG rule.

**FIRST CLAIM FOR RELIEF:  VIOLATION OF THE APA FOR FAILURE TO MAKE THE REQUIRED FINDINGS FOR A STAY UNDER 5 U.S.C. § 705**

56.     The allegations above are incorporated by reference.

57.     EPA's promulgation of the Indefinite Stay is "final agency action for which there

is no other adequate remedy in a court" within the meaning of the APA, 5 U.S.C. § 704.

58.     Under 5 U.S.C. § 705, an agency may only "postpone the effective date of action

taken by it" if it "finds that justice so requires."

59.     This Court has held that, under this provision, "the standard for a stay at the

agency level is the same as the standard for a stay at the judicial level: each is governed by the

four-part preliminary injunction test applied in this Circuit."  *Sierra Club v. Jackson*, 833 F.

Supp. 2d at 30.  Thus, an agency must base any administrative stay under 5 U.S.C. § 705 on

specific findings that legal challenges to the agency action are likely to succeed on the merits,

that there will be irreparable harm absent a stay, that this harm is greater than the harm to others who would be deprived of benefits of a rule because of a stay, and that the public interest is served by a stay. *Id.*

60.     EPA's prior practice has been to consider the four-factor preliminary injunction test when reviewing requests to postpone the effective dates of rules under 5 U.S.C. § 705. *See, e.g.*, 76 Fed. Reg. 28,318, 28,326 (May 17, 2011); 76 Fed. Reg. 4780, 4788 (Jan. 26, 2011); 75 Fed. Reg. 49,556, 49,563 (Aug. 13, 2010).

61.     The Indefinite Stay does not mention the four-part preliminary injunction test, much less make findings under each of the four factors for a preliminary injunction.

62.     Therefore, the Indefinite Stay violates 5 U.S.C. § 705, is arbitrary and capricious, not in accordance with law, an abuse of discretion, and in excess of EPA's statutory jurisdiction and authority, under 5 U.S.C. § 706.

### SECOND CLAIM FOR RELIEF:  VIOLATION OF THE APA TO STAY A RULE FOR PURPOSES OF RECONSIDERING IT

63.     The allegations above are incorporated by reference.

64.     5 U.S.C. § 705 permits an agency to postpone the effective date of a rule "pending judicial review," and does not authorize staying a rule for other purposes, such as pending agency reconsideration of a rule.

65.     EPA issued the Indefinite Stay for the purpose of reviewing petitions to reconsider the ELG rule, rather than for the purpose of maintaining the status quo pending judicial review.  In fact, contemporaneously with issuing the Indefinite Stay, EPA sought and was granted an abeyance of judicial review in the U.S. Court of Appeals for the Fifth Circuit.

66.    In its notice announcing the Indefinite Stay, EPA failed to address the merits of the legal challenges to the ELG rule, instead basing its action on the petitions for reconsideration and the fact that industry would have to bear costs to comply with the rule.

67.    The Indefinite Stay is therefore arbitrary and capricious, an abuse of discretion, not in accordance with law, and in excess of EPA's statutory jurisdiction and authority, under 5 U.S.C. § 706.

### THIRD CLAIM FOR RELIEF:  VIOLATION OF THE APA TO STAY A RULE WHERE THE EFFECTIVE DATE HAS ALREADY PASSED

68.    The allegations above are incorporated by reference.

69.    By applying 5 U.S.C. § 705 to a rule that was already in effect, EPA in issuing the Indefinite Stay contradicted the plain meaning of "postpon[ing] the effective date" of a rule.  5 U.S.C. § 705.

70.    In issuing the Indefinite Stay, EPA also contradicted its own prior practice in interpreting 5 U.S.C. § 705 to apply to only rules whose effective date had not yet passed.  *See, e.g.*, 76 Fed. Reg. at 4800 ("Postponing an effective date implies action before the effective date arrives.").

71.    The effective date of the ELG rule was January 4, 2016.

72.    EPA, by invoking 5 U.S.C. § 705 to indefinitely stay certain compliance deadlines for the ELG rule despite the fact that the ELG rule had already been in effect since January 4, 2016, acted in a manner that was arbitrary and capricious, an abuse of discretion, not in accordance with law, and in excess of EPA's statutory authority.  5 U.S.C. § 706.

### FOURTH CLAIM FOR RELIEF: VIOLATION OF THE APA TO SELECTIVELY STAY PORTIONS OF A RULE WHILE LEAVING OTHERS IN EFFECT

73.    The allegations above are incorporated by reference.

74.     The plain language of 5 U.S.C. § 705 provides federal agencies with authority to "postpone the effective date" of a rule in its entirety to preserve the regulatory status quo. 5 U.S.C. § 705 does not provide federal agencies with authority to selectively postpone the effectiveness of portions of a rule while leaving others in effect.

75.     The legacy wastewater and leachate exemptions in the ELG rule went into effect on the rule's effective date of January 4, 2016.

76.     The legacy wastewater and leachate exemptions in the ELG rule are unaffected by the Indefinite Stay.

77.     The Indefinite Stay does not purport to stay the ELG rule in its entirety, but instead only stays compliance deadlines for new, more stringent effluent limitations and standards, while leaving in effect other portions of the rule (including the legacy wastewater and leachate exemptions).

78.     By applying 5 U.S.C. § 705 to stay only portions of the ELG rule, while leaving other portions in effect, EPA in issuing the Indefinite Stay contradicted the plain meaning of "postpon[ing] the effective date" of a rule.  5 U.S.C. § 705.

79.     The Indefinite Stay only preserves the regulatory status quo that existed prior to EPA's promulgation of the ELG rule with respect to some portions of the rule but not others, without providing a reasoned explanation as to why only certain portions of the rule should be stayed.

80.     The Indefinite Stay is therefore arbitrary and capricious, an abuse of discretion, not in accordance with law, and in excess of EPA's statutory jurisdiction and authority, under 5 U.S.C. § 706.

**FIFTH CLAIM FOR RELIEF:  VIOLATION OF APA FOR FAILURE TO PROVIDE ADEQUATE JUSTIFICATION AND CONSIDER RELEVANT FACTORS**

81.     The allegations above are incorporated by reference.

82.     The grounds offered by EPA do not justify the Indefinite Stay.

83.     EPA failed to consider the Indefinite Stay's impacts to any person or entity other than regulated facilities, and EPA failed to consider the Indefinite Stay's impacts on public health and the environment.

84.     The Indefinite Stay is therefore arbitrary and capricious, an abuse of discretion, not in accordance with law, and in excess of EPA's statutory jurisdiction and authority, under 5 U.S.C. § 706.

**SIXTH CLAIM FOR RELIEF: VIOLATION OF APA FOR FAILURE TO PROVIDE PRIOR NOTICE AND AN OPPORTUNITY TO COMMENT**

85.     The allegations above are incorporated by reference.

86.     The APA requires that, prior to promulgating a rule, "[g]eneral notice of [the] proposed rule making shall be published in the Federal Register."  5 U.S.C. § 553(b).  The APA further requires that "[a]fter notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments . . . " *Id.* § 553(c).

87.     EPA failed to provide prior notice of the Indefinite Stay, and failed to provide an opportunity to comment on the stay prior to issuance of the Indefinite Stay, as required by 5 U.S.C. § 553.

88.     By indefinitely postponing certain compliances deadlines in the ELG rule, the Indefinite Stay is a final action with binding legal effect.

89.     The Indefinite Stay therefore violates 5 U.S.C. § 553, and is also arbitrary and capricious, an abuse of discretion, not in accordance with law, and in excess of EPA's statutory jurisdiction and authority, under 5 U.S.C. § 706.

### PRAYER FOR RELIEF

For the foregoing reasons, Plaintiffs request that the Court:

a.     declare that the Indefinite Stay is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in violation of the APA, 5 U.S.C. § 706(2)(A);

b.     vacate the Indefinite Stay;

c.     issue a mandatory injunction compelling EPA to reinstate all ELG rule compliance deadlines;

d.     award Plaintiffs their litigation costs and reasonable attorneys' fees in this action; and,

e.     provide any other necessary and appropriate relief.

DATED:  May 3, 2017

*/s/ Jennifer C. Chavez*
Jennifer C. Chavez (D.C. Bar No. 493421)
Earthjustice
1625 Massachusetts Avenue NW, Suite 702
Washington, D.C. 20036
T: (202) 667-4500
E: jchavez@earthjustice.org

*/s/ Thomas J. Cmar*
Thomas J. Cmar (Illinois Bar No. 6298307) (*pro hac vice* pending)
Earthjustice
1101 Lake Street, Suite 405B
Oak Park, IL 60301
T: (312) 257-9338
E: tcmar@earthjustice.org

*/s/ Matthew Gerhart*
Matthew Gerhart (Washington Bar No. 42787) (*pro hac vice* pending)
3639 N Clayton Street
Denver, CO 80205
T: (510) 847-7721
E: megerhart@gmail.com

*Counsel for Plaintiffs Clean Water Action, Sierra Club, and Waterkeeper Alliance, Inc.*

*/s/ Casey Austin Roberts*
Casey Austin Roberts (California Bar. No. 253474) (*pro hac vice* pending)
Sierra Club
Environmental Law Program
1536 Wynkoop Street, Suite 200
Denver, CO 80202
T: (303) 454-3355
E: casey.roberts@sierraclub.org

*/s/ Joshua Smith*
Joshua Smith (Florida Bar No. 0096844) (*pro hac vice* pending)
Sierra Club
Environmental Law Program
2101 Webster Street, Suite 1300
Oakland, CA 94612
T: (415) 977-5560
E: joshua.smith@sierraclub.org

*Counsel for Plaintiff Sierra Club*

*/s/ Abel Russ*
Abel Russ (D.C. Bar No. 1007020)
Environmental Integrity Project
1000 Vermont Avenue NW, Suite 1100
Washington, DC 20005
T: (802) 482-5379
E: aruss@environmentalintegrity.org

*/s/ Lisa Widawsky Hallowell*
Lisa Widawsky Hallowell (Pennsylvania Bar No. 207983) (*pro hac vice* pending)
Environmental Integrity Project
509 Vine Street, Apt. 2A
Philadelphia, PA 19106

T: (202) 294-3282
E: lhallowell@environmentalintegrity.org

*Counsel for Plaintiffs Environmental Integrity Project,*
*PennEnvironment, Inc., Chesapeake Climate Action Network,*
*Physicians for Social Responsibility, Chesapeake, Inc., and Prairie*
*Rivers Network*