# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CLEAN WATER ACTION, *et al*.,<br><br>　　　　Plaintiffs,<br><br>　v.<br><br>E. SCOTT PRUITT, *Administrator, U.S.*<br>*Environmental Protection Agency, et al*.,<br><br>　　　　Defendants. | Civil Action No. 17-cv-00817 (KBJ) |

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs Clean Water Action, Environmental Integrity Project, Sierra Club, Waterkeeper Alliance, Inc., PennEnvironment, Inc., Chesapeake Climate Action Network, Physicians for Social Responsibility, Chesapeake, Inc., and Prairie Rivers Network (collectively, "Plaintiffs") hereby move for summary judgment pursuant to Federal Rule of Civil Procedure 56 and Local Rule 7(h) of the Local Rules of the U.S. District Court for the District of Columbia.

Plaintiffs are entitled to summary judgment as a matter of law because the defendants E. Scott Pruitt, Administrator of the United States Environmental Protection Agency, and the United States Environmental Protection Agency (collectively "EPA") violated the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-06, in issuing the April 25, 2017 Federal Register notice, 82 Fed. Reg. 19,005 (Apr. 25, 2017), which purports to indefinitely stay certain compliance deadlines in EPA's November 2015 final rule revising the Clean Water Act Effluent Limitation Guidelines for steam electric power plants (the "ELG Rule").

Accordingly, Plaintiffs respectfully request that this Court grant Plaintiffs' Motion for Summary Judgment, vacate EPA's action published at 82 Fed. Reg. 19,005, and direct EPA, as

soon as possible, to transmit a letter to the Utility Water Act Group and each National Pollutant Discharge Elimination System ("NPDES") permitting authority which (1) explains this Court's decision vacating EPA's action and (2) states that the ELG Rule is in effect and must be implemented according to its terms.

In support of this Motion, Plaintiffs submit a Memorandum of Points and Authorities and accompanying Exhibits, a Statement of Material Facts as to Which There is No Genuine Dispute, and a Proposed Order.

Respectfully submitted this 14th day of June 2017,

/s/ Jennifer C. Chavez
Jennifer C. Chavez (D.C. Bar No. 493421)
Earthjustice
1625 Massachusetts Avenue NW, Suite 702
Washington, D.C. 20036
T: (202) 667-4500
E: jchavez@earthjustice.org

/s/ Thomas J. Cmar
Thomas J. Cmar (Illinois Bar No. 6298307) (pro hac vice)
Earthjustice
1101 Lake Street, Suite 405B
Oak Park, IL 60301
T: (312) 257-9338
E: tcmar@earthjustice.org

/s/ Matthew Gerhart
Matthew Gerhart (Washington Bar No. 42787) (pro hac vice)
3639 N Clayton Street
Denver, CO 80205
T: (510) 847-7721
E: megerhart@gmail.com

Counsel for Plaintiffs Clean Water Action, Sierra Club,
and Waterkeeper Alliance, Inc.

/s/ Casey Austin Roberts
Casey Austin Roberts (California Bar. No. 253474) (pro hac vice)
Sierra Club
Environmental Law Program

1536 Wynkoop Street, Suite 200
Denver, CO 80202
T: (303) 454-3355
E: casey.roberts@sierraclub.org

*/s/ Joshua Smith*
Joshua Smith (Florida Bar No. 0096844) (*pro hac vice*)
Sierra Club
Environmental Law Program
2101 Webster Street, Suite 1300
Oakland, CA 94612
T: (415) 977-5560
E: joshua.smith@sierraclub.org

*Counsel for Plaintiff Sierra Club*

*/s/ Abel Russ*
Abel Russ (D.C. Bar No. 1007020)
Environmental Integrity Project
1000 Vermont Avenue NW, Suite 1100
Washington, DC 20005
T: (802) 482-5379
E: aruss@environmentalintegrity.org

*/s/ Lisa Widawsky Hallowell*
Lisa Widawsky Hallowell (Pennsylvania Bar No. 207983) (*pro hac vice*)
Environmental Integrity Project
509 Vine Street, Apt. 2A
Philadelphia, PA 19106
T: (202) 294-3282
E: lhallowell@environmentalintegrity.org

*Counsel for Plaintiffs Environmental Integrity Project, PennEnvironment, Inc., Chesapeake Climate Action Network, Physicians for Social Responsibility, Chesapeake, Inc., and Prairie Rivers Network*

MOT-3

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CLEAN WATER ACTION, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> E. SCOTT PRUITT, *Administrator, U.S. Environmental Protection Agency, et al.*, <br><br> Defendants. | Civil Action No. 17-cv-00817 (KBJ) |

## PLAINTIFFS' STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE

### Water Pollution from Power Plants

1.      As an industry, power plants discharge more toxic water pollution (defined by EPA as "toxic weighted pound equivalents") than any other industrial point source category in the United States.  *Final Environmental Assessment*, ROA Doc. No. 12553[1] at 3-15, Table 3-3.

2.      Wastewater discharged by power plants can contain toxic metals such as mercury, arsenic, and selenium, as well as nonconventional pollutants such as nitrogen and dissolved solids that contaminate drinking water and harm ecosystems.  80 Fed. Reg. 67,838, 67,840–41 (Nov. 3, 2015), ROA Doc No. 12841.

3.      The pollutants present in wastewater discharged by power plants can, among other things, cause several types of cancer, lower children's IQs, and cause deformities and reproductive harm to fish and other wildlife.  *Id.* at 67,838.

---

[1] Plaintiffs cite documents in the administrative record according to the Record on Appeal Document Number ("ROA Doc. No.") in the Administrative Record Index which EPA filed on June 13, 2017.  The ROA Doc. No. appears in the first column of EPA's document entries.

**Issuance of the Final ELG Rule**

4.      On November 3, 2015, EPA published a notice in the Federal Register issuing the final Effluent Limitations Guidelines Rule for the steam electric industry.  *Id.* at 67,838.

5.      The ELG Rule states that "[t]he final rule is effective on January 4, 2016."  *Id.* at 67,838.

6.      The final ELG Rule prohibits existing power plants subject to the rule from discharging fly ash and bottom ash wastewater generated after the compliance date for each facility.  40 C.F.R. § 423.13(h)(1)(i), (k)(1)(i).

7.      The final ELG Rule requires existing power plants subject to the rule to meet numeric limits on the concentration of arsenic, mercury, selenium, and nitrate/nitrite in flue gas desulfurization ("FGD") wastewater generated after the compliance date for each facility.  *Id.* § 423.13(g)(1)(i).

8.      For existing power plants that discharge directly to a waterbody, the compliance dates for the Best Available Technology ("BAT") limits for fly ash, bottom ash, and FGD wastewater are set by each plant's National Pollutant Discharge Elimination System ("NPDES") permitting authority, and must be "as soon as possible" beginning November 1, 2018, but no later than December 31, 2023.  80 Fed. Reg. at 67,854, codified at 40 C.F.R. § 423.13(g)(1)(i), (h)(1)(i), (k)(1)(i),

9.      For power plants that discharge to a wastewater treatment plant rather than directly to a waterbody (known as "indirect dischargers"), the compliance date for the BAT limits for fly ash, bottom ash, and FGD wastewater is November 1, 2018.  40 C.F.R § 423.16(e)-(i).

10. In determining the Best Available Technology for existing power plants, EPA declined to limit the concentration of toxic pollutants in combustion residual leachate that may be discharged. *Id.* § 423.13(l). Instead, the BAT limits for leachate limit only total suspended solids. *Id.*

11. In the final ELG Rule, for all wastestreams generated before the compliance date determined by the source's NPDES permitting authority, EPA set no limits on toxic pollutants as part of the BAT limits. 80 Fed. Reg. at 67,854, codified at 40 C.F.R. § 423.13(g)(1)(ii), (h)(1)(ii), (i)(1)(ii), (j)(1)(ii), (k)(1)(ii).

**Benefits of the Final ELG Rule**

12. EPA calculated that the final ELG Rule would prevent 1.4 billion pounds of pollutants from being discharged into our nation's waterways every year. 80 Fed. Reg. at 67,841.

13. EPA found that by reducing water pollution, the ELG Rule would reduce harm to human health, including reducing the incidence of cancer, cardiovascular disease, and neurological problems. *Final Benefit & Cost Analysis*, ROA Doc. No. 12843 at 2-3 to 2-5.

14. EPA concluded that the ELG Rule would produce many other benefits, including expanded commercial and recreational fishing, a reduction in the cost to clean up environmental contamination, and a decrease in harmful air emissions. *Id.* at 2-1, 2-5 to 2-7.

15. EPA estimated that the final ELG Rule would produce between $451 and $566 million in annual benefits. *Id.* at 11-1.[2]

---

[2] EPA produced this estimate using a 3% discount rate.

16.     EPA did not quantify or monetize all of the benefits of the ELG Rule, such as certain health improvements and reduced treatment costs for drinking water utilities.  *Id.* at 2-13 (Table 2-1), 11-1.

**Developments After Issuance of the Final ELG Rule**

17.     Seven petitions for review of the ELG Rule were filed.  *See* 82 Fed. Reg. 19,005, 19,005 (Apr. 25, 2017).

18.     The petitions were consolidated in the Fifth Circuit Court of Appeals. Consolidation Order, *In re: EPA, Effluent Limitation Guidelines*, MCP No. 136, ECF Doc. 3 (J.P.M.L. Dec. 8, 2015); Consolidation Order, *Sw. Elec. Power Co. v. EPA*, No. 15-60821, ECF Doc. 00513301255 (5th Cir. Dec. 9, 2015).

19.     On March 24, 2017, the Utility Water Act Group ("UWAG") filed a petition with EPA requesting that the Agency reconsider the ELG Rule and stay all deadlines in the Rule. ROA Doc. No. 12844; *see also* 82 Fed. Reg. at 19,005.

20.     On April 5, 2017, the Advocacy Office of the U.S. Small Business Administration ("SBA") filed a petition with EPA requesting that the Agency reconsider the ELG Rule.  ROA Doc. No. 12848; *see also* 82 Fed. Reg. at 19,005.

21.     On April 11, 2017, EPA Administrator Scott Pruitt sent a letter to each state "reminding them of flexibilities available to NPDES permitting authorities under the 2015 Steam Electric ELG Final Rule."  EPA, Steam Electric Generating Effluent Guidelines—Petitions for Reconsideration, *available at* https://www.epa.gov/eg/steam-electric-power-generating-effluent-guidelines-petitions-reconsideration.

22.     On April 12, 2017, EPA Administrator Scott Pruitt sent a letter to UWAG and SBA stating that EPA intended to reconsider the final ELG rule and to issue an administrative

stay under Section 705 of the Administrative Procedure Act.  ROA Doc. No. 12849; *see also* 82 Fed. Reg. at 19,005.

23.    On April 24, 2017, the Fifth Circuit granted EPA's motion to hold the cases in abeyance until August 12, 2017.  Order, *Sw. Elec. Power Co. v. EPA*, No. 15-60821, ECF Doc. 00513964356 (5th Cir. Apr. 24, 2017).

**The Indefinite Stay**

24.    On April 25, 2017, EPA published in the Federal Register a notice announcing the "postponement of the compliance dates that have not yet passed" in the ELG Rule.  82 Fed. Reg. at 19,006.

25.    Specifically, for existing plants which are direct dischargers, EPA postponed the deadlines for meeting the new standards for fly and bottom ash, FGD, flue gas mercury control, and gasification wastewater.  *Id.*

26.    For existing plants which are indirect dischargers, EPA postponed the deadlines for meeting the new standards for fly and bottom ash, FGD, flue gas mercury control, and gasification wastewater. *Id.*

27.    EPA also purported to stay the definition of the phrase "as soon as possible." *Id.*

28.    In its notice announcing the stay, EPA states that justice requires staying the ELG Rule in light of the capital expenses companies will need to make to comply with the Rule's requirements.  *Id.* at 19,005.

29.    EPA further states in the notice that "EPA is not making any concession of error with respect to the rulemaking."  *Id.*

30.    The notice cites 5 U.S.C. § 705 as authority for the stay, and states that "the Agency finds that justice requires it to postpone the compliance dates of the Rule that have not yet passed, pending judicial review." *Id.*

31.    The notice does not mention the four-part test for a preliminary injunction, nor does the notice attempt to demonstrate that the four-part test for a preliminary injunction is satisfied. *See id.* at 19,005-06.

32.    The notice does not identify any legal errors EPA made in the final ELG Rule. *See id.*

33.    The notice does not identify any issues raised in the pending litigation in the Fifth Circuit Court of Appeals as the basis for the stay. *See id.*

34.    EPA did not provide interested persons with an opportunity to comment on the indefinite stay of ELG compliance deadlines prior to publishing the notice of the indefinite stay in the Federal Register on April 25, 2017. *See id.* at 19,005-06.

35.    EPA did not publish in the Federal Register a proposed rule prior to publishing the notice of the indefinite stay of ELG Rule compliance deadlines in the Federal Register on April 25, 2017. *See id.*

36.    The notice of the indefinite stay of ELG Rule compliance deadlines does not discuss or otherwise analyze how staying the ELG Rule will deprive people of the benefits of the ELG Rule. *See id.*

37.    The notice of the indefinite stay of the ELG Rule compliance deadlines does not attempt to quantify the reduction in benefits which will result from the stay of the ELG Rule. *See id.*

DATED:  June 14, 2017

/s/ Jennifer C. Chavez
Jennifer C. Chavez (D.C. Bar No. 493421)
Earthjustice
1625 Massachusetts Avenue NW, Suite 702
Washington, D.C. 20036
T: (202) 667-4500
E: jchavez@earthjustice.org

/s/ Thomas J. Cmar
Thomas J. Cmar (Illinois Bar No. 6298307) (pro hac vice)
Earthjustice
1101 Lake Street, Suite 405B
Oak Park, IL 60301
T: (312) 257-9338
E: tcmar@earthjustice.org

/s/ Matthew Gerhart
Matthew Gerhart (Washington Bar No. 42787) (pro hac vice)
3639 N Clayton Street
Denver, CO 80205
T: (510) 847-7721
E: megerhart@gmail.com

Counsel for Plaintiffs Clean Water Action, Sierra Club,
and Waterkeeper Alliance, Inc.

/s/ Casey Austin Roberts
Casey Austin Roberts (California Bar. No. 253474) (pro hac vice)
Sierra Club
Environmental Law Program
1536 Wynkoop Street, Suite 312
Denver, CO 80202
T: (303) 454-3355
E: casey.roberts@sierraclub.org

/s/ Joshua Smith
Joshua Smith (Florida Bar No. 0096844) (pro hac vice)
Sierra Club
Environmental Law Program
2101 Webster Street, Suite 1300
Oakland, CA 94612
T: (415) 977-5560
E: joshua.smith@sierraclub.org

*Counsel for Plaintiff Sierra Club*

<u>/s/ Abel Russ</u>
Abel Russ (D.C. Bar No. 1007020)
Environmental Integrity Project
1000 Vermont Avenue NW, Suite 1100
Washington, DC 20005
T: (802) 482-5379
E: aruss@environmentalintegrity.org

<u>/s/ Lisa Widawsky Hallowell</u>
Lisa Widawsky Hallowell (Pennsylvania Bar No. 207983) (*pro hac vice*)
Environmental Integrity Project
509 Vine Street, Apt. 2A
Philadelphia, PA 19106
T: (202) 294-3282
E: lhallowell@environmentalintegrity.org

*Counsel for Plaintiffs Environmental Integrity Project, PennEnvironment, Inc., Chesapeake Climate Action Network, Physicians for Social Responsibility, Chesapeake, Inc., and Prairie Rivers Network*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

CLEAN WATER ACTION, *et al*.,

              Plaintiffs,

    v.

E. SCOTT PRUITT, *Administrator, U.S.
Environmental Protection Agency, et al*.,

              Defendants.

Civil Action No. 17-cv-00817 (KBJ)

# PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
# IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF CONTENTS................................................................................................ii

TABLE OF AUTHORITIES ........................................................................................iii

INTRODUCTION .......................................................................................................... 1

STATEMENT OF FACTS ............................................................................................. 3

    I.     WATER POLLUTION FROM POWER PLANTS ................................. 3

    II.    THE CLEAN WATER ACT AND EPA'S DEVELOPMENT OF EFFLUENT
            LIMITATIONS FOR POWER PLANTS ............................................... 4

    III.   EPA'S 2015 FINAL EFFLUENT LIMITATION GUIDELINES RULE ................ 5

    IV.   BENEFITS OF THE ELGS ................................................................ 8

    V.    LEGAL CHALLENGES TO THE FINAL ELG RULE........................... 9

    VI.   IMPLEMENTATION OF THE ELGS ................................................ 10

    VII.  THE INDEFINITE STAY ................................................................ 11

STANDARD OF REVIEW ........................................................................................... 12

ARGUMENT ............................................................................................................... 13

    I.     PLAINTIFFS HAVE STANDING. ..................................................... 13

    II.    EPA FAILED TO SATISFY THE FOUR-PART TEST FOR A STAY UNDER 5
            U.S.C. § 705. ............................................................................... 19

    III.   EPA LACKS AUTHORITY TO STAY THE ELG RULE FOR PURPOSES OF
            RECONSIDERATION RATHER THAN JUDICIAL REVIEW.......................... 25

    IV.   THE APA DOES NOT AUTHORIZE EPA TO "POSTPONE THE EFFECTIVE
            DATE" OF A RULE THAT IS ALREADY IN EFFECT. ..................................... 28

    V.    EPA FAILED TO CONSIDER AN IMPORTANT ASPECT OF THE PROBLEM
            BY FAILING TO CONSIDER THE BENEFITS TO THE PUBLIC OF THE ELG
            RULE. ........................................................................................... 31

    VI.   EPA'S FAILURE TO PROVIDE PRIOR NOTICE AND AN OPPORTUNITY TO
            COMMENT VIOLATES THE APA. ...................................................... 34

    VII.  THE COURT SHOULD VACATE WITH INSTRUCTIONS.............................. 39

         A.   The Court Should Vacate the Indefinite Stay. ................................. 39

         B.   In Addition to Vacating the Rule, the Court Should Order EPA to Send Letters
              to Utilities and States. ............................................................. 41

CONCLUSION............................................................................................................ 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advocates for Highway & Auto Safety v. Fed. Highway Admin.*,
    28 F.3d 1288 (D.C. Cir. 1994)..................................................................................38

*Alaska Ctr. for Env't v. Browner*,
    20 F.3d 981 (9th Cir. 1994)....................................................................................44

*Alaska Ctr. for the Env't v. Reilly*,
    796 F. Supp. 1374 (W.D. Wash. 1992)..................................................................44

\* *Allina Health Servs. v. Sebelius*,
    746 F.3d 1102 (D.C. Cir. 2014)........................................................................40, 44

*Am. Hosp. Ass'n v. Bowen*,
    834 F.2d 1037 (D.C. Cir. 1987)............................................................................37

*Atl. City Elec. Co. v. FERC*,
    295 F.3d 1 (D.C. Cir. 2002)..................................................................................13

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*,
    462 U.S. 87 (1983).................................................................................................13

*Batterton v. Marshall*,
    648 F.2d 694 (D.C. Cir. 1980)..............................................................................37

*BellSouth Corp. v. FCC*,
    162 F.3d 1215 (D.C. Cir. 1999)............................................................................31

*Bowen v. Georgetown Univ. Hosp.*,
    488 U.S. 204 (1988)..............................................................................................13

*Burlington N. & Santa Fe Ry. Co. v. White*,
    548 U.S. 53 (2006).................................................................................................26

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006)..............................................................................23

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971)..............................................................................................31

\* Authorities upon which we chiefly rely are marked with an asterisk.

*Cobell v. Norton*,
     240 F.3d 1081 (D.C. Cir. 2001) ........................................................................41

*Council of S. Mountains, Inc. v. Donovan*,
     653 F.2d 573 (D.C. Cir. 1981) ..........................................................................35

*Crocker v. Piedmont Aviation, Inc.*,
     49 F.3d 735 (D.C. Cir. 1995) ............................................................................41

*Ctr. for Energy & Econ. Dev. v. EPA*,
     398 F.3d 653 (D.C. Cir. 2005) ....................................................................17, 18

*Ctr. for Sci. in the Pub. Interest v. Dep't of the Treasury*,
     573 F. Supp. 1168 (D.D.C. 1983), *appeal dismissed*, 727 F.2d 1161 (D.C. Cir.
     1984) ..................................................................................................................32

*Ctr. for Sustainable Econ. v. Jewell*,
     779 F.3d 588 (D.C. Cir. 2015) ..........................................................................19

*Douglas Timber Operators, Inc. v. Salazar*,
     774 F. Supp. 2d 245 (D.D.C. 2011) ..................................................................16

*E.I. DuPont de Nemours & Co. v. Train*,
     430 U.S. 112 (1977) .............................................................................................4

*Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*,
     653 F.3d 1 (D.C. Cir. 2011) ...............................................................................36

* *Encino Motorcars, LLC v. Navarro*,
     — U.S. —,136 S. Ct. 2117 (2016) ...............................................................22, 30

* *Envtl. Def. Fund, Inc. v. Gorsuch*,
     713 F.2d 802 (D.C. Cir. 1983) .....................................................................34, 36

*FCC v. Fox Television Stations, Inc.*,
     556 U.S. 502 (2009) ...........................................................................................22

* *Flaherty v. Pritzker*,
     17 F. Supp. 3d 52 (D.D.C. 2014) .......................................................................43

*Franklin v. Gwinnett County Public Schools*,
     503 U.S. 60 (1992) .............................................................................................41

*Fraternal Order of Police Library of Congress Labor Comm. v. Library of
     Congress*,
     639 F. Supp. 2d 20 (D.D.C. 2009) ....................................................................23

\* *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*,
  528 U.S 167 (2000)..........................................................................................13, 15, 17

*In re GTE Serv. Corp.*,
  762 F.2d 1024 (D.C. Cir. 1985)..............................................................................25

*Hunt v. Wash. St. Apple Advert. Comm'n*,
  432 U.S. 333 (1977)..............................................................................................14

*IMS, P.C. v. Alvarez*,
  129 F.3d 618 (D.C. Cir. 1997)................................................................................33

*Int'l Ladies' Garment Workers' Union v. Donovan*,
  722 F.2d 795 (D.C. Cir. 1983)................................................................................15

*Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*,
  477 U.S. 274 (1986)..............................................................................................19

\* *Jicarilla Apache Nation v. U.S. Dep't of Interior*,
  613 F.3d 1112 (D.C. Cir. 2010) .......................................................................22, 30

*John Doe Co. v. Consumer Fin. Prot. Bureau*,
  849 F.3d 1129 (D.C. Cir. 2017) .............................................................................23

*League of Women Voters of U.S. v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) ...................................................................................20

*Loma Linda Univ. Med. Ctr. v. Sebelius*,
  684 F. Supp. 2d 42 (D.D.C. 2010), *aff'd*, 2010 WL 4903887 (D.C. Cir. Dec. 2,
  2010) .....................................................................................................................12

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992)........................................................................................13, 18

*In re Lyon Cty. Landfill, Lynd, Mn.*,
  406 F.3d 981 (8th Cir. 2005) .................................................................................21

*Marsh v. Or. Nat. Res. Council*,
  490 U.S. 360 (1989)..............................................................................................31

*Mendoza v. Perez*,
  754 F.3d 1002 (D.C. Cir. 2014) .............................................................................36

*Merriweather v. Sherwood*,
  235 F. Supp. 2d 339 (S.D.N.Y. 2002)....................................................................28

*Mexichem Specialty Resins, Inc. v. EPA*,
  787 F.3d 544 (D.C. Cir. 2015) (Kavanaugh, J., dissenting) ...................................25

\* *Michigan v. EPA*,
   — U.S. —, 135 S. Ct. 2699 (2015)................................................................31, 32, 33

*Mingo Logan Coal Co. v. EPA*,
   829 F.3d 710 (D.C. Cir. 2016) ...........................................................................31

*Motor & Equip. Mfrs. Ass'n v. Nichols*,
   142 F.3d 449 (D.C. Cir. 1998) ...........................................................................18

\* *Motor Vehicle Mfrs.' Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983)..............................................................................13, 31, 33

*N.J. Dep't of Envtl. Protection v. EPA*,
   626 F.2d 1038 (D.C. Cir. 1980) .........................................................................37

*Nat'l Mining Ass'n v. Jackson*,
   856 F. Supp. 2d 150 (D.D.C. 2012) ....................................................................33

*Nat'l Treasury Emps. Union v. Cornelius*,
   617 F. Supp. 365 (D.D.C. 1985) ........................................................................34

*Nat'l Wildlife Fed'n v. Clark*,
   630 F. Supp. 412 (D.D.C. 1985) ........................................................................16

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
   524 F.3d 917 (9th Cir. 2008) .............................................................................44

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
   No. CV 01-640-RE, 2005 WL 2488447 (D. Or. Oct. 7, 2005) .............................44

*Nat. Res. Def. Council, Inc. v. Abraham*,
   355 F.3d 179 (2d Cir. 2004)...............................................................................35

\* *Nat. Res. Def. Council, Inc. v. EPA*,
   683 F.2d 752 (3d Cir. 1982)....................................................................35, 36, 38

*Nat. Res. Def. Council, Inc. v. EPA*,
   859 F.2d 156 (D.C. Cir. 1988) .............................................................................4

*Nat. Res. Def. Council, Inc. v. Train*,
   510 F.2d 692 (D.C. Cir. 1974) .............................................................................4

*In re Pub. Serv. Co. of N. H.*,
   1 E.A.D. 389, 1977 WL 45581 (1977) ................................................................21

*Public Citizen v. Steed*,
   733 F.2d 93 (D.C. Cir. 1984) .............................................................................34

*Ranchers Cattlemen Action Legal Fund v. USDA*,
  566 F. Supp. 2d 995 (D.S.D. 2008) ...................................................................35

*Resisting Envtl. Destruction on Indigenous Lands, REDOIL v. U.S. E.P.A.*,
  716 F.3d 1155 (9th Cir. 2013) ........................................................................22

*Rumsfeld v. Forum for Acad. and Inst. Rights, Inc.*,
  547 U.S. 47 (2006)..........................................................................................14

* *Safety-Kleen Corp. v. EPA*,
  No. 92-1629, 1996 U.S. App. LEXIS 2324 (D.C. Cir. Jan. 19, 1996) (per
  curiam) ......................................................................................................29, 35

*Setser v. United States*,
  566 U.S. 231 (2012).........................................................................................28

*Sierra Club v. EPA*,
  699 F.3d 530 (D.C. Cir. 2012) ....................................................................16, 18

* *Sierra Club v. Jackson*,
  833 F. Supp. 2d 11 (D.D.C. 2012) ...................................20, 24, 25, 26, 27, 28

*Stuttering Found. of Am. v. Springer*,
  498 F. Supp. 2d 203 (D.D.C. 2007) ................................................................12

*U.S. Steel Corp. v. EPA*,
  595 F.2d 207 (5th Cir. 1979) ..........................................................................38

*U.S. Sugar Corp. v. EPA*,
  844 F.3d 268 (D.C. Cir. 2016) ........................................................................40

*United Student Aid Funds, Inc. v. Devos*,
  No. 15-CV-01137 (APM), 2017 WL 728044 (D.D.C. Feb. 23, 2017)...................33

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)........................................................................................22, 24

**Statutes**

5 U.S.C. § 551(4) ................................................................................................34

5 U.S.C. § 551(5) ................................................................................................34

5 U.S.C. § 553 .....................................................................................................35

5 U.S.C. § 553(b)(3)(A) ......................................................................................37

5 U.S.C. § 553(b)(3)(A), (d)(2)..................................................................36

5 U.S.C. § 553(b)(3)(B) ..........................................................................37

* 5 U.S.C. § 553(b)-(c) ..............................................................34, 39, 40

5 U.S.C. §§ 701-06 ..............................................................................1, 12

* 5 U.S.C. § 705.....................2, 11, 19, 20, 21, 22, 24, 25, 26, 28, 29, 30, 35, 39

5 U.S.C. § 706(2) ...................................................................................40

5 U.S.C. § 706(2)(A)..............................................................................12

5 U.S.C. § 1009(d) .................................................................................20

28 U.S.C. § 1331.....................................................................................12

33 U.S.C. § 1251(a) ...............................................................................44

33 U.S.C. § 1251(a)(1)..............................................................................4

33 U.S.C. § 1311......................................................................................4

33 U.S.C. § 1311(b)(1)(A) .......................................................................4

33 U.S.C. § 1311(b)(2) .......................................................................4, 25

33 U.S.C. § 1311(d) .................................................................................5

33 U.S.C. § 1314(b) .................................................................................5

33 U.S.C. § 1342(b)(1)(B) .....................................................................16

33 U.S.C. § 1369(b) ...............................................................................12

42 U.S.C. § 7607(d)(7)(B) .....................................................................26

**Regulations**

40 C.F.R. § 125.3(c)(2) ..........................................................................30

40 C.F.R § 423.11(t) ................................................................................7

40 C.F.R. § 423.12(b)(3)-(4).....................................................................5

40 C.F.R. § 423.13(g)(1)(i)........................................................................7

40 C.F.R. § 423.13(g)(1)(i), (h)(1)(i), (i)(1)(i), (j)(1)(i), (k)(1)(i) ...................................................7

40 C.F.R. § 423.13(g)(1)(i), (h)(1)(i), (k)(1)(i) .....................................................................15, 42

40 C.F.R. § 423.13(g)(1)(ii) ..................................................................................................8

40 C.F.R. § 423.13(g)(1)(ii), (h)(1)(ii), (i)(1)(ii), (j)(1)(ii), (k)(1)(ii)..............................................30

40 C.F.R. § 423.13(h)(1)(i), (k)(1)(i) .....................................................................................6

40 C.F.R § 423.13(l) ...................................................................................................7, 30

40 C.F.R. § 423.16(e) ..........................................................................................................7

40 C.F.R. § 423.16(e)-(i) .................................................................................................7, 42

40 C.F.R. § 423.16(f)-(g) .....................................................................................................6

## Federal Register Notices

47 Fed. Reg. 52,290 (Nov. 19, 1982)..........................................................................................5

57 Fed. Reg. 5320 (Feb. 13, 1992) ..........................................................................................21

61 Fed. Reg. 28,508 (June 5, 1996) .........................................................................................30

75 Fed. Reg. 49,556 (Aug. 13, 2010).....................................................................................21, 29

76 Fed. Reg. 28,318 (May 17, 2011) ..................................................................................21, 29, 30

76 Fed. Reg. 4780 (Jan. 26, 2011) .....................................................................................21, 29

78 Fed. Reg. 34,432 (June 7, 2013) ...........................................................................................6

80 Fed. Reg. 67,838 (Nov. 3, 2015).........................................1, 3, 5, 6, 7, 8, 9, 10, 28, 29, 33, 38

81 Fed. Reg. 31,344 (May 18, 2016) .......................................................................................16

82 Fed. Reg. 19,005 (Apr. 25, 2017) .....1, 10, 11, 23, 24, 25, 26, 27, 29, 30, 31, 32, 34, 36, 38, 45

82 Fed. Reg. 26,017 (June 6, 2017) ................................................................11, 12, 25, 38, 39

**Other Authorities**

Administrative Procedure Act, Pub. L. 1944–46, S. Doc. 248 (1946) ..........................................20

Fed. R. Civ. P. 56(a) ...................................................................................................................12

## INTRODUCTION

Plaintiffs Clean Water Action, Environmental Integrity Project, Sierra Club, Waterkeeper Alliance, Inc., PennEnvironment, Inc., Chesapeake Climate Action Network, Physicians for Social Responsibility, Chesapeake, Inc., and Prairie Rivers Network (collectively "Plaintiffs") respectfully submit this Memorandum of Points and Authorities in Support of their Motion for Summary Judgment. Plaintiffs bring this case under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-06, to challenge the U.S. Environmental Protection Agency's ("EPA") action to indefinitely delay compliance deadlines in the Agency's Effluent Limitation Guidelines Rule for steam electric power plants ("ELG Rule"). Postponement of Certain Compliance Dates for Effluent Limitations Guidelines and Standards for the Steam Electric Power Generating Point Source Category, 82 Fed. Reg. 19,005 (Apr. 25, 2017) (the "Indefinite Stay").[1]

EPA issued the ELG Rule in 2015 to update national Clean Water Act standards for coal-fired and other steam electric power plants (known as "effluent limitations") that are based on the level of reduction or elimination of water pollution that is achievable through currently available, affordable wastewater treatment technologies. *See* 80 Fed. Reg. 67,838 (Nov. 3, 2015), ROA Doc. No. 12841.[2] Prior to this rulemaking, EPA had not updated these standards since 1982, despite the fact that power plants are by far the largest source of toxic water pollution in the nation. If implemented, the ELG Rule would prevent more than a billion tons of pollutants from being dumped into our nation's waterways each year, including toxic pollutants such as lead, mercury, arsenic, and selenium. EPA found that this pollution directly leads to lower IQs

---

[1] On June 13, 2017, EPA filed a motion to dismiss this action on jurisdictional grounds, or in the alternative to transfer it to the Fifth Circuit Court of Appeals or stay it. ECF Doc. 18. Plaintiffs oppose EPA's motion and, pursuant to Local Civil Rule 7(b), intend to file a response no later than June 27, 2017.

[2] For materials in the administrative record, Plaintiffs cite the Record on Appeal Document Number ("ROA Doc. No.") provided in EPA's certified index to the record. Administrative Record Index for EPA's Postponement for Certain Compliance Deadlines for the Steam Electric Effluent Guidelines Rule, ECF Doc. 19-2 (June 13, 2017). The ROA Doc. No. appears in the first column on the left-hand side of the table in the record index.

and developmental problems in children, diseases such as cancer and heart disease in adults, and numerous other harmful impacts to aquatic life, wildlife, and environmental quality.

EPA's Stay indefinitely eliminates the public health and environmental benefits of the ELG Rule. EPA purported to issue the Indefinite Stay under the APA, 5 U.S.C. § 705, which authorizes agencies to postpone the effective date of a rule pending judicial review, if the agency finds that the 4-part test for a stay is met. Yet the Indefinite Stay violates each of these three criteria for a lawful stay: (1) EPA failed to make any findings whatsoever regarding the 4-part test for a stay; (2) EPA did not issue the Indefinite Stay in response to pending judicial review, but instead did so for the express purpose of administratively reconsidering the ELG Rule; and (3) the effective date of the ELG Rule (which was January 4, 2016) had long since passed when EPA issued the Stay, and EPA cannot postpone an effective date that has already occurred. In addition, EPA issued the Indefinite Stay in violation of the bedrock procedural requirement of the APA that agencies provide the public with notice and an opportunity to comment before finalizing a rule.

Even if the APA authorized EPA to issue a stay here, which it does not, the Indefinite Stay is arbitrary and capricious. EPA justified the Stay based on the alleged costs that industry would have to incur to meet upcoming compliance deadlines. But EPA failed to consider how delaying compliance with the ELG Rule would delay the benefits of the Rule, which EPA itself estimated at more than $450 million per year in improved public health and environmental quality. EPA's failure to consider any of the disadvantages of the Indefinite Stay violates a basic tenet of reasoned decisionmaking, that an agency must consider both the advantages and disadvantages of issuing a rule.

In light of the multiple substantive and procedural deficiencies in the Indefinite Stay, this Court must vacate the Stay. In addition, to fully cure EPA's unlawful delay in implementing the ELG Rule, the Court should also order EPA to send a letter to utilities and the states informing them that the Indefinite Stay has been vacated and that the ELG Rule is in effect and must be implemented according to its terms. Such instructions are necessary to cure the harm caused by letters EPA sent to power plant owners, and to every state, prior to issuing the Indefinite Stay in which EPA announced its intention to stay the ELG Rule and urged state permitting authorities to extend the deadlines for complying with the ELG Rule.

## STATEMENT OF FACTS

## I.    WATER POLLUTION FROM POWER PLANTS

Power plants are by far the largest source of toxic water pollution in the United States, as they generate more toxic water pollution than the next two-largest polluting industries combined. *Final Environmental Assessment* at 3-15, Table 3-3, ROA Doc. No. 12553. Power plant wastewater contains toxic metals such as mercury, arsenic, and selenium, as well as nonconventional pollutants such as nitrogen and dissolved solids that contaminate drinking water and harm ecosystems. 80 Fed. Reg. at 67,840-41. "The pollutants discharged by [power plants] can cause severe health and environmental problems in the form of cancer and non-cancer risks in humans, lowered IQ among children, and deformities and reproductive harm in fish and wildlife." *Id.* at 67,838.

Power plants release this pollution near almost 100 public drinking water intakes and approximately 1,500 wells, and studies confirm that drinking water supplies are adversely affected by the pollution. *Id.* at 67,840. Power plant pollution also contaminates fish that people eat—an impact that is borne disproportionately by minority and low-income communities. *Id.* Water pollution from power plants makes over 4,000 miles of rivers unsafe for use as a source of

3

drinking water or for fish, and makes over 6,000 miles of rivers unsafe for children to use for

recreational fishing.  *Final Environmental Assessment* at 7-35 (Table 7-14).  EPA estimates that

roughly 30 million people are exposed to fish contaminated by power plant wastewater,

including over 3 million young children exposed to lead every year and over 400,000 infants

exposed to mercury in utero every year.  *Final Benefit & Cost Analysis* at 3-4, 3-9, 3-16, ROA

Doc. No.12843.

## II.    THE CLEAN WATER ACT AND EPA'S DEVELOPMENT OF EFFLUENT LIMITATIONS FOR POWER PLANTS

The Clean Water Act sets a national goal of eliminating pollution discharged into our

nation's waterways.  33 U.S.C. § 1251(a)(1).  To achieve that goal, EPA must establish

increasingly stringent, technology-based limits, which are designed to spur industry to adopt new

technologies for reducing, and ultimately eliminating, water pollution.  *Id.* § 1311; *see also Nat.*

*Res. Def. Council, Inc. v. EPA*, 859 F.2d 156, 202 (D.C. Cir. 1988) ("[T]he primary purpose of

the CWA is the *elimination* of all pollutant discharges . . . . The central mechanism for achieving

this goal is promulgation and imposition of increasingly stringent effluent limits.").[3]  These

effluent limitations must be based on effluent limitation guidelines, or ELGs, promulgated by

EPA, which are nation-wide, minimum standards for categories of sources.  *E.I. DuPont de*

*Nemours & Co. v. Train*, 430 U.S. 112, 127, 129 (1977).  ELGs set a federal floor for

environmental protection, based on application of wastewater treatment technology, in order to

avoid a "race to the bottom" by state regulators.  *See Nat. Res. Def. Council, Inc. v. Train*, 510

---

[3] For pollutants the Clean Water Act classifies as either toxic (such as heavy metals) or "nonconventional" (such as nitrogen), the first standards to be met were best practicable control technology, which Congress intended to apply to all pollutant dischargers by 1977, 33 U.S.C. § 1311(b)(1)(A), followed by the more stringent best available technology, which Congress intended to apply to all dischargers by 1989, *id.* § 1311(b)(2).

F.2d 692, 709-10 (D.C. Cir. 1974). The Clean Water Act requires EPA to reevaluate its effluent limitations every five years, 33 U.S.C. § 1311(d), and the ELGs every year, *id.* § 1314(b).

Notwithstanding these statutory deadlines, EPA delayed for nearly 33 years before finalizing the rule at issue in this case. EPA had not updated ELGs for power plants since 1982. *See* 47 Fed. Reg. 52,290 (Nov. 19, 1982). The 1982 guidelines did not set any specific limits on the discharge of toxic metals in power plant wastewater. *See* 40 C.F.R. § 423.12(b)(3)-(4); 80 Fed. Reg. at 67,840-41.[4] In the 1982 rulemaking, EPA acknowledged that future revisions would be necessary to address wastewaters from air pollution control systems, specifically flue gas desulfurization systems, commonly known as scrubbers. *See* 47 Fed. Reg. at 52,291 ("reserving effluent limitations for four types of wastewaters for future rulemaking" including "[f]lue gas desulfurization waters").

In 2010, Defenders of Wildlife and Sierra Club (represented by Environmental Integrity Project and Earthjustice) sued EPA in this Court for its failure to comply with the Clean Water Act requirements to review and revise the power plant ELGs. *See Defs. of Wildlife v. Jackson*, No. 1:10-cv-01915-RWR (D.D.C.). In March 2012, the Court approved a consent decree setting deadlines for EPA to issue a proposed and final rule. With the consent of plaintiffs in that action, these deadlines were repeatedly extended to allow EPA further time to consider and develop the record. EPA issued the proposed ELG rule in April 2013 and signed the final rule on September 30, 2015.

## III.    EPA'S 2015 FINAL EFFLUENT LIMITATION GUIDELINES RULE

The ELG Rule is designed to reduce toxic wastewater from power plants, which generate at least six different wastewater streams regulated by the Rule. *See* 80 Fed. Reg. at 67,841. The

---

[4] The 1982 ELG rule did set BPT limits on total suspended solids, *see* 40 C.F.R. § 423.12(b)(3)-(4), which require some reduction of metals in particulate form in coal combustion wastewater.

three largest of these wastestreams are fly ash and bottom ash transport water, and flue gas desulfurization wastewater, also called scrubber wastewater.  78 Fed. Reg. 34,432, 34,449, 34,471 (June 7, 2013); 80 Fed. Reg. at 67,854; *Final Technical Development Document* at 6-7, 8-15, 8-18, ROA Doc. No. 12840 ("*Final TDD*").  When power plants burn coal or oil, some of the fuel is not completely combusted; the lighter ash is called fly ash, and the heavier ash is called bottom ash.  *Final TDD* at 4-6.  To dispose of the ash, many plants use water to transport the fly ash and bottom ash away from the boiler and then discharge it, hence the name fly ash and bottom ash transport water.  *Id.* at 4-19 to 4-24.  Scrubbers are devices that remove sulfur dioxide from a plant's exhaust gas.  80 Fed. Reg. at 67,846.  The most common type of scrubber uses water in combination with a reagent, and therefore generates a wastewater stream, referred to as scrubber wastewater.  *See id.*; *see also Final TDD* at 4-29.

EPA found that most power plants already dispose of fly ash in a way that leads to no discharge of fly ash transport water, and EPA concluded that it was both feasible and cost-effective for the remainder of the industry to adopt the methods currently in use to eliminate discharges of fly ash transport water.  80 Fed. Reg. at 67,852.  While fewer plants dispose of bottom ash in a manner that does not discharge bottom ash transport water, EPA found that cost-effective technologies are in use today that can prevent the discharge of any bottom ash transport water.  *Id.* at 67,852-53.  Based on these findings, EPA determined that the Clean Water Act requires existing power plants[5] to meet a zero-discharge standard for both fly ash and bottom ash wastewater, meaning that plants must either recycle the wastewater or dispose of the ash without using water.  40 C.F.R. §§ 423.13(h)(1)(i), (k)(1)(i), 423.16(f)-(g).  By contrast, the ELG Rule allows existing plants to continue to discharge scrubber wastewater, but limits the concentration

---

[5] The ELG Rule also sets standards for new sources (i.e., new power plants), but those new source performance standards are not affected by the Indefinite Stay and thus not at issue in this case.

of certain pollutants in the wastewater, including mercury, arsenic, selenium, and nitrate/nitrite.
*Id*. §§ 423.13(g)(1)(i), 423.16(e).

The compliance deadlines for existing power plants vary based on whether the plant
sends the wastewater to a wastewater treatment plant (an "indirect discharger") or dumps its
wastewater directly into a waterway (a "direct discharger").  *See* 80 Fed. Reg. at 67,842.  Indirect
dischargers must comply with the new standards by November 1, 2018.  *See* 40 C.F.R.
§ 423.16(e)-(i).  Direct dischargers, which make up the overwhelming majority of facilities
subject to these standards, were granted an extended compliance period.  *See* 80 Fed. Reg. at
67,854.  The final rule requires a compliance date that is "as soon as possible" after November 1,
2018, but no later than December 31, 2023.  *Id*. at 67,854; codified at 40 C.F.R. §
423.13(g)(1)(i), (h)(1)(i), (i)(1)(i), (j)(1)(i), (k)(1)(i).  The actual compliance date for a particular
direct discharger will be determined by the entity that issues the plant's National Pollutant
Discharge Elimination System ("NPDES") permit, which is typically the relevant state
environmental agency.  *See* 40 C.F.R § 423.11(t).

The extended and flexible compliance schedule for direct dischargers does not apply to
all of the new standards in the ELG Rule.  For combustion residual leachate, which refers to
liquids that drain out of a landfill or surface impoundment containing constituents of coal ash or
materials from the plant's air pollution control systems,[6] EPA set the best available technology,
or BAT, limits equal to the already-existing, 1982 standards, which set limits on solid particles in
the wastewater ("total suspended solids") and "oil and grease" but no limits on specific toxic
metals such as mercury, arsenic, and lead.  80 Fed. Reg. at 67,841; *see also* 40 C.F.R § 423.13(l).
The final BAT limitations for leachate "apply on the date that a permit is issued to a discharger,

---

[6] 80 Fed. Reg. at 67,847.

following the effective date of this rule." 80 Fed. Reg. at 67,882. EPA further explained that "[t]he rule does not build in an implementation period for meeting these limitations" because the BAT limits are equal to the existing standards. *Id.*

In addition, EPA determined that wastewater generated prior to the date that the new ELGs take effect at a particular plant would be considered "legacy wastewater," and would be exempt from EPA's new, more stringent BAT limits on toxic metals. *See* 80 Fed. Reg. at 67,854. In other words, EPA "grandfathered" all wastewater created prior to the compliance date. EPA did not specify a compliance date for the legacy wastewater standards, but because these standards are equal to the 1982 limits on total suspended solids and oil and grease (*see, e.g.*, 40 C.F.R. § 423.13(g)(1)(ii)), the compliance date would be the date of permit issuance after the rule goes into effect, as is the case for the new leachate standards.

## IV.    BENEFITS OF THE ELGS

When it issued the ELG Rule, EPA detailed the benefits that would result from reduced pollution to the nation's waters, which fell into three general categories: "enhanced surface water quality, reduced health risks, and increased productivity in economic activities that are adversely affected by steam electric discharges." *Final Benefit & Cost Analysis* at 2-1. Additional benefits would result from reduced air emissions, reduced water usage, and reduced risks associated with surface impoundments used to contain coal combustion wastes that present the potential for groundwater contamination and catastrophic collapse. *Id.* For example, EPA estimated that lower levels of arsenic, mercury, and lead in drinking water and fish tissue would lead to reduced incidence of cancer, cardiovascular disease, and adverse neurological effects among members of the public. *Id.* at 2-3 to 2-5. EPA assessed benefits that would result from healthier aquatic ecosystems, including expanded commercial and recreational fishing, and those resulting from improved surface water quality such as expanded recreational activities like fishing, hunting,

swimming, and boating.  *Id.* at 2-5 to 2-7.  EPA also quantified economic productivity benefits like reduced impoundment risks and marketability of dry fly ash and bottom ash once it is no longer deposited in the nation's waters.  *Id.* at 2-9 to 2-11.

In total, the benefits that EPA was able to monetize range from $451 to $566 million annually.  80 Fed. Reg. at 67,838, 67,841-42.[7]  However, EPA acknowledged that it was unable to quantify or monetize many significant benefits of the rule, including reduced drinking water treatment costs, reduced incidence of many cancers and non-cancer benefits, reduced groundwater contamination, benefits to commercial fisheries and the tourism industry, and increased availability of surface water for other uses.  *See Final Benefit & Cost Analysis* at 2-13 to 2-15 (Table 2-1).

### V.    LEGAL CHALLENGES TO THE FINAL ELG RULE

Parties (including several of the Plaintiff organizations) filed seven petitions for review of the final ELG Rule.  The Panel on Multi-District Litigation selected the Fifth Circuit as the circuit in which the cases should be heard, and all petitions have been consolidated in the Fifth Circuit.  *See* Consolidation Order, *In re: EPA, Effluent Limitation Guidelines*, MCP No. 136, ECF Doc. 3 (J.P.M.L. Dec. 8, 2015); Consolidation Order, *Sw. Elec. Power Co. v. EPA*, No. 15-60821, ECF Doc. 00513301255 (5th Cir. Dec. 9, 2015).  On April 14, 2017, EPA filed a motion requesting that the Court hold all deadlines in the litigation in abeyance because EPA intends to reconsider the Rule.  EPA Motion to Hold Proceedings in Abeyance While the Agency Undertakes Reconsideration, *Sw. Elec. Power Co. v. EPA*, No. 15-60821, ECF Doc. 00513952863 (5th Cir. Apr. 14, 2017).  On April 24, 2017, the Fifth Circuit granted EPA's

---

[7] EPA arrived at these numbers by using a 3% discount rate.  80 Fed. Reg. at 67,842 (Table III).  EPA estimated the Rule would produce benefits of $387 to $478 million using a 7% discount rate.  *Id.*

motion and ordered that the cases be held in abeyance until August 12, 2017. Order, *Sw. Elec. Power Co. v. EPA*, No. 15-60821, ECF Doc. 00513964356 (5th Cir. Apr. 24, 2017).

## VI.    IMPLEMENTATION OF THE ELGS

The Final ELGs became effective on January 4, 2016. 80 Fed. Reg. at 67,838. Any NPDES permit issued after January 4, 2016 must include the permitting authority's determination as to when the ELGs will become effective at that facility—*i.e.*, the permitting authority's determination of the "as soon as possible" date. *Id.* at 67,883.

On March 24, 2017, more than 15 months after ELG implementation began, the Utility Water Act Group ("UWAG")[8] filed a petition with EPA requesting that the agency stay all deadlines in the ELG Rule and reconsider the Rule. ROA Doc. No. 12844. On April 5, 2017, the Advocacy Office of the U.S. Small Business Administration ("SBA") also filed a petition with EPA requesting that the agency reconsider the Rule. ROA Doc. No. 12848.

On April 11, 2017, EPA Administrator Scott Pruitt sent a letter to each state "reminding them of flexibilities available to NPDES permitting authorities under the 2015 Steam Electric ELG Final Rule."[9] An EPA website posts an example letter to Virginia Governor Terry McAuliffe, which highlights the permitting authority's discretion to delay the compliance date until as late as December 31, 2023 for direct dischargers.[10] The next day, Administrator Pruitt sent a letter to UWAG and SBA stating that EPA intended to reconsider the final ELG rule and

---

[8] "UWAG is a voluntary, *ad hoc*, unincorporated group of 163 individual energy companies and three national trade associations of energy companies: Edison Electric Institute, the National Rural Electric Cooperative Association, and the American Public Power Association." 82 Fed. Reg. at 19,005 n.1.

[9] *See* EPA, Steam Electric Power Generating Effluent Guidelines - Petitions for Reconsideration, *available at* https://www.epa.gov/eg/steam-electric-power-generating-effluent-guidelines-petitions-reconsideration (last visited June 14, 2017).

[10] *See* Letter from E. Scott Pruitt, EPA Administrator to Terry McAuliffe, Governor of Va. (Apr. 11, 2017), *available at* https://www.epa.gov/sites/production/files/2017-04/documents/steam-electric-elg_letter-to-va-mcauliffe_04-11-2017.pdf.

to issue an administrative stay under Section 705 of the Administrative Procedure Act.  ROA

Doc. No. 12849.

## VII.        THE INDEFINITE STAY

That same day, April 12, Administrator Pruitt signed a notice purporting to stay

indefinitely "the compliance deadlines for the new, more stringent limitations and standards" in

the ELG rule.  82 Fed. Reg. at 19,005.  The stay became effective upon publication in the

Federal Register on April 25, 2017.  *Id.*

The Indefinite Stay states that the ELG Rule requires compliance by indirect dischargers

with certain standards by November 1, 2018, and by direct dischargers as early as November 1,

2018.  EPA asserts that "[i]n light of the capital expenditures that facilities incurring costs under

the Rule will need to undertake in order to meet the compliance deadlines, . . . justice requires

[EPA] to postpone the compliance dates of the Rule that have not yet passed, pending judicial

review."  *Id.*  The "Postponement of Compliance Dates" section in the Indefinite Stay

specifically lists the Code of Federal Register sections containing the compliance dates that are

stayed.  *Id.* at 19,006.

EPA did not provide the public with prior notice of, or an opportunity to comment on, the

Indefinite Stay.  However, EPA's April 12 letter to UWAG and SBA states that "because an

administrative stay lasts only during the pendency of judicial review, the EPA intends to conduct

notice and comment rulemaking during the reconsideration period to stay or amend the

compliance deadlines in the rule."[11]  On June 6, 2017, EPA published notice of a proposal to

postpone certain compliance dates in the ELGs until the agency completes reconsideration of the

2015 rule.  82 Fed. Reg. 26,017 (June 6, 2017).  In that notice, EPA acknowledges the current

---

[11] *See supra* April 12 Letter to UWAG and SBA.

administrative stay, and explains that it is proposing a subsequent stay that would be in effect "in the event that the [Fifth Circuit] litigation ends, and while the Agency is undertaking reconsideration."  *Id.* at 26,018.

Plaintiffs initiated this action by filing a complaint with this Court on May 3, 2017.  ECF Doc. 1. Service on the Federal Government was completed by May 11, 2017.  ECF Docs. 14-17.[12]  On June 13, 2017, EPA filed a motion to dismiss this action, or in the alternative to transfer it to the Fifth Circuit or stay it.  ECF Doc. 18.[13]  On the same day, EPA also filed its certified index of the administrative record.  ECF Doc. 19.

## STANDARD OF REVIEW

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Summary judgment is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the APA standard of review."  *Loma Linda Univ. Med. Ctr. v. Sebelius*, 684 F. Supp. 2d 42, 52 (D.D.C. 2010), *aff'd*, 2010 WL 4903887 (D.C. Cir. Dec. 2, 2010); *accord Stuttering Found. of Am. v. Springer*, 498 F. Supp. 2d 203, 207 (D.D.C. 2007).

Under the APA, a reviewing court "shall hold unlawful and set aside agency actions" that it determines are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  In addition, "[i]t is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress."

---

[12] Plaintiffs have a right of action here under the APA, 5 U.S.C. §§ 701-06, which provides for judicial review of agency actions for which there is no other adequate remedy in court, because the Indefinite Stay does not fall within any of the seven categories of actions enumerated in 33 U.S.C. § 1369(b) that the Clean Water Act requires be challenged in a U.S. Circuit Court of Appeals.  This Court has jurisdiction under the federal question statute, 28 U.S.C. § 1331.

[13] As noted above, pursuant to Local Civil Rule 7(b), Plaintiffs oppose EPA's motion and intend to file a response no later than June 27, 2017.

*Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). "In the absence of statutory authorization for its act, an 'agency's action is plainly contrary to law and cannot stand.'" *Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 8 (D.C. Cir. 2002) (quoting *Michigan v. EPA*, 268 F.3d 1075, 1081 (D.C. Cir. 2001)).

Agency action is arbitrary and capricious where an agency has "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs.' Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). A decision can be upheld only where the agency "considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983).

## ARGUMENT

### I.    PLAINTIFFS HAVE STANDING.

"[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S 167, 180-81 (2000) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). Under the doctrine of associational standing, "an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."

*Hunt v. Wash. St. Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  "[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. Forum for Acad. and Inst. Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006).

Members of Plaintiffs would have standing to sue in their own right.  As the attached declarations demonstrate, individual members suffer concrete injuries as a result of EPA staying certain compliance deadlines in the ELG Rule and thereby delaying reductions in harmful pollution in waters that those individuals use and enjoy.  Plaintiffs' members live near power plants that discharge coal ash wastewater.[14]  They regularly fish, boat, canoe, kayak, and swim in waterways downstream of power plants that discharge coal ash wastewater.[15]  Members regularly observe wildlife and birds near power plants.[16]  And members' drinking water comes from water supplies affected by power plant discharges of coal ash wastewater.[17]

Many of Plaintiffs' members have limited their use of waterways impacted by toxic wastewater discharges from coal-fired power plants due to concerns about the health effects of ingesting or contacting toxic pollutants, or consuming fish caught in those waters.[18]  *See*

---

[14] Declaration of Don Davis, ¶ 4, Attached as Exhibit 1 ("Davis Decl."); Declaration of Howard Dent, ¶ 1, Attached as Exhibit 2 ("Dent Decl."); Declaration of Chasidy Hobbs, ¶ 2, Attached as Exhibit 3 ("Hobbs Decl."); Declaration of Kurt Limbach, ¶ 6, Attached as Exhibit 4 ("Limbach Decl.").

[15] Declaration of Diana Conway, ¶¶ 5-7 ("Conway Decl."), Attached as Exhibit 5 (Ms. Conway, her husband, and her children regularly fish in the Potomac River near the Dickerson power plant); Davis Decl. ¶¶ 6-7 (he owns land adjacent to a river downstream of the Dallman power plant, and he fishes and hunts on his property); Dent Decl. ¶¶ 5-6 (he boats, swims, fishes and raises oysters along a creek downstream from the Morgantown power plant); Hobbs Decl. ¶¶ 5-6, 8-9 (for the past 20 years, she has regularly canoed and kayaked on the Escambia River and Thompson Bayou, where her son and dog swim as well, and which is downstream from the Crist power plant); Limbach Decl. ¶ 8 (he regularly kayaks on the Conemaugh River downstream of the Conemaugh Generating Station).

[16] Conway Decl. ¶¶ 3, 6 (she and her husband regularly hike and kayak along the Potomac River, downstream of the Dickerson power plant, to observe wildlife); Declaration of Ted Popovich, ¶¶ 6, 8, Attached as Exhibit 6 ("Popovich Decl.") (when hiking or walking along the Allegheny River near the Cheswick power plant, he enjoys watching birds and other wildlife); Declaration of Timothy Whitehouse, ¶¶ 8, Attached as Exhibit 7 ("Whitehouse Decl.") (he regularly birdwatches along the Potomac River near the Dickerson power plant and is concerned about the impact of water pollution on birds and other wildlife).

[17] Declaration of Mark Bryant, ¶ 8, Attached as Exhibit 8 ("Bryant Decl.").

[18] *E.g.*, Bryant Decl. ¶ 8 (he does not drink water straight from the tap because the Culley power plant dumps pollution into the source water, the Ohio River), ¶¶ 6-7 (he does not recreate in the Ohio River, or allow his children

*generally Laidlaw*, 528 U.S. at 184 (in a Clean Water Act case, holding that reasonable fear of harm from pollution is an injury in fact).  In addition, Plaintiffs' members' observation and enjoyment of wildlife is reduced by their concern that wildlife are poisoned by ingesting toxic pollutants discharged by power plants.[19]

Plaintiffs' members would benefit from prompt implementation of the ELG Rule, which would eliminate the discharge of fly ash and bottom ash wastewater, and greatly reduce the discharge of scrubber wastewater, *see* 40 C.F.R. § 423.13(g)(1)(i), (h)(1)(i), (k)(1)(i) (requiring existing direct dischargers to limit the concentration of certain pollutants in discharges of scrubber wastewater and eliminate the discharge of fly ash and bottom ash).  By staying certain compliance deadlines in the ELG Rule, the Indefinite Stay postpones the day when Plaintiffs' members will receive the benefits of the ELG Rule, namely, a reduction in toxic water pollution to waters they use and enjoy.[20]  In similar situations where plaintiffs would benefit from implementation of a rule, courts in this Circuit have held that plaintiffs have standing to challenge the weakening or repeal of the regulation.  *See, e.g.*, *Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 799, 809-12 (D.C. Cir. 1983) (holding that labor unions

---

[19] *E.g.*, Popovich Decl. ¶ 9; Conway Decl. ¶ 6.

[19] or dogs to do so, due to concerns about pollution); Dent Decl. ¶ 6 (he does not eat larger fish he catches from the Potomac River because of the toxic pollution dumped into the River by the Morgantown power plant); Hobbs Decl. ¶¶ 15-16 (she does not swim in waterways downstream of the Crist power plant, and eats fewer fish caught from those waters, because of pollution from the Crist plant); Limbach Decl. ¶¶ 8 (he avoid swimming in the Conemaugh River in order to limit his exposure to harmful pollution from the Conemaugh power plant), 9 (he would not eat fish caught from the Conemaugh River because of the pollution levels in the fish)

[20] *See, e.g.*, Bryant Decl. ¶¶ 8, 13 (delaying implementation of the ELG Rule denies him the benefits of the rule, including a reduction in water pollution along the Ohio River, which is the source of his drinking water); Conway Decl. ¶¶ 5, 7 (opposing the Stay because it will lead to continued water pollution, which causes her to refrain from eating fish she catches because the fish may have high levels of contaminants); Davis Decl. ¶¶ 5-7 (EPA's stay delays reductions in the water pollution, which leads him to limit where he fishes and worry about the health risks of hunting animals that use the polluted waters); Dent Decl. ¶¶ 5, 10 (expressing concern that delaying the ELG Rule will allow continued pollution, which he fears harms his health when he boats and swims in the river downstream of the Morgantown power plant); Hobbs Decl. ¶ 24 (she will continue to worry about the Crist power plant's pollution of the waters where she swims, kayaks, and observes wildlife because the ELG Rule is not being implemented and therefore the water pollution will continue unabated); Limbach Decl. ¶ 11 (he would have worried less about his health, and kayaked and fished more, if EPA had not issued the stay and delayed reductions in pollution along the Conemaugh River).

representing factory workers, and other associations, had standing to challenge the repeal of restrictions on home work); *Nat'l Wildlife Fed'n v. Clark*, 630 F. Supp. 412, 415-16 (D.D.C. 1985) (environmental organization representing members who use waterways for recreation, education, aesthetic enjoyment and also for drinking water had standing to challenge the repeal of  regulations governing federal water resource development projects).

Plaintiffs' members are harmed by toxic water pollution from power plants, for which draft NPDES permits have been issued, and which set deadlines to comply with the ELG Rule.[21] By indefinitely delaying compliance deadlines in the ELG Rule, EPA has increased the likelihood that these permits will not be finalized at all until the uncertainty over the ELG Rule is resolved, or that the permits will be finalized without any deadlines for ELG compliance.[22] Similarly, many of Plaintiffs' members are harmed by toxic water pollution from power plants with expired NPDES permits[23] that could be renewed at any time.[24]

Furthermore, the Indefinite Stay harms Plaintiffs and their members because the Stay was issued without providing the public with an opportunity to comment on the Stay before finalizing it.  *See Sierra Club v. EPA*, 699 F.3d 530, 533 (D.C. Cir. 2012) (holding that plaintiff Sierra Club had standing to assert that EPA had violated notice-and-comment requirements in issuing a Clean Air Act rule); *Douglas Timber Operators, Inc. v. Salazar*, 774 F. Supp. 2d 245, 255

---

[21] Hobbs Decl. ¶ 20; Bryant Decl. ¶¶ 8, 10-13; Declaration of Jodi Perras ¶¶ 9-11, Attached as Exhibit 9 ("Perras Decl.").

[22] Hobbs Decl. ¶ 23; Declaration of Dalal Aboulhosn, ¶ 10, Attached as Exhibit 10 ("Aboulhosn Decl."); Perras Decl. ¶¶ 10-11, 13.  The Clean Water Act authorizes a NPDES permits to remain in effect for up to 5 years before it must be renewed.  33 U.S.C. § 1342(b)(1)(B).  If a NPDES permit is issued without any compliance deadlines for the ELG Rule, it could take 5 years before a compliance date is inserted in that permit.  *See* Aboulhosn Decl. ¶ 10.

[23] As explained *supra* note 22, NPDES permits may not last for more than 5 years.  An "expired permit" refers to a permit that has exceeded its stated duration, or has exceeded the statutory maximum duration of 5 years, but has not been reissued by the permitting authority.  In that case, if the facility applied for a new permit, but the permitting authority has not reissued the permit, many states' laws provide that the expired permit is automatically extended until the state takes final action on the new permit application.  *See* 81 Fed. Reg. 31,344, 31,356 (May 18, 2016).

[24] *See* Conway Decl. ¶¶ 5-6; Dent Decl. ¶ ; Davis Decl. ¶¶ 6-7; Popovich Decl. ¶¶ 6-8; Declaration of Susan Martin ¶¶ 8-11 , Attached as Exhibit 11 ("Martin Decl."); Declaration of Patrick Grenter, ¶¶  4-5, 7, Attached as Exhibit 12 ("Grenter Decl."); Declaration of David Masur ¶ 9, Attached as Exhibit 13 ('Masur Decl."); Whitehouse Decl. ¶ 10.

(D.D.C. 2011) (finding that plaintiffs established standing where "they have asserted concrete interests (economic and environmental harms) and allege only in addition that they were denied an opportunity to comment on the withdrawal decision").  Plaintiffs and their members submitted extensive comments on the proposed ELG Rule, Declaration of Eric Schaeffer, ¶ 14, Attached as Exhibit 14 ("Schaeffer Decl."), and on proposed NPDES permits that incorporate the ELG Rule, Aboulhosn Decl. ¶ 8.  If EPA had followed the law and provided notice and an opportunity to comment, Plaintiffs and their members would have submitted comments on the Indefinite Stay. *Id.* ¶¶ 13, 15.

In short, as a result of the indefinite delay in implementing the ELG Rule, Plaintiffs' members will continue to be harmed by the toxic water pollution that the ELG Rule was supposed to eliminate or reduce.  These injuries to Plaintiffs' members' aesthetic, health, property, and recreational interests establish the requisite injury-in-fact to satisfy Article III standing requirements.  *See Laidlaw*, 528 U.S. at 183 ("plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity'" (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972))).

Plaintiffs' members' injuries are "fairly traceable" to EPA's decision to delay the pollution reductions that would be achieved by the ELG Rule, even though the reductions themselves are implemented at particular power plants through NPDES permits.  *See generally Ctr. for Energy & Econ. Dev. v. EPA*, 398 F.3d 653, 658 (D.C. Cir. 2005) (holding that an EPA "regulatory scheme 'is at least a substantial factor motivating the [states'] actions,' and the Center alleges an injury to its members that is 'fairly traceable' to that scheme" (quoting *Cmty.*

*for Creative Non–Violence v. Pierce*, 814 F.2d 663, 669 (D.C. Cir. 1987))).[25]  These injuries

would be redressed by a favorable decision vacating the Indefinite Stay and instructing EPA to

implement the ELG Rule, which would eliminate or reduce the discharges of toxic water

pollution that harm Plaintiffs' members.  *See Ctr. for Energy & Econ. Dev.*, 398 F.3d at 657

("Where an agency rule causes the injury," as here, "the redressability requirement may be

satisfied . . . by vacating the challenged rule and giving the aggrieved party the opportunity to

participate in a new rulemaking the results of which might be more favorable to it." (quoting

*Am.'s Cmty. Bankers v. FDIC*, 200 F.3d 822, 828-29 (D.C. Cir. 2000))); *Motor & Equip. Mfrs.*

*Ass'n v. Nichols*, 142 F.3d 449, 458 (D.C. Cir. 1998) (holding that petitioners satisfied the

redressability requirement because if the challenged EPA rule were vacated, petitioners could

urge the agency to issue a new rule more favorable to the petitioners).[26]

     Moreover, the issue at stake here—the proper implementation of a Clean Water Act rule

that will eliminate or reduce toxic water pollution from power plants—is central to the groups'

institutional missions.[27]  Certain of the Plaintiff organizations secured a consent decree requiring

EPA to review and update the regulations at issue here, *Defs. of Wildlife v. EPA*, No. 1:10-cv-

01915-RWR (D.D.C. filed Nov. 8, 2010), and Plaintiffs submitted numerous and extensive

comments on the proposed rule, *see, e.g.*, Comments of Environmental Integrity Project et al.,

---

[25] Plaintiffs also easily satisfy the relaxed causation standard for procedural claims such as Plaintiffs' claim that EPA violated the APA's notice-and-comment requirements.  *See Sierra Club v. EPA*, 699 F.3d at 533 (where the petitioner asserted a violation of notice-and-comment requirements and had concrete interests at stake, the petitioner "enjoys some slack in showing a causal relation between its members' injury and the legal violation claimed").

[26] As with causation, Plainitffs also easily meet the relaxed redressability standard appropriate for procedural claims such as Plaintiffs' claim that EPA violated the APA's notice-and-comment requirements.  *See Lujan,* 504 U.S. at 572 n.7 ("The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy.").

[27] *See* Aboulhosn Decl. ¶¶ 3-14; Declaration of Marc Yaggi, ¶¶ 3-7, 10-14, 16, 18, 21, Attached as Exhibit 15 ("Yaggi Decl."); Declaration of Lynn Thorp, ¶¶ 3-8, Attached as Exhibit 16 ("Thorp Decl."); Schaeffer Decl. ¶¶ 3-5; 7-10, 13-14; Declaration of Carol Hays, ¶¶ 2-5, 7, Attached as Exhibit 17 ("Hays Decl."); Declaration of Michael Tidwell, ¶¶ 3-8, 10-11, Attached as Exhibit 18 ("Tidwell Decl."); Whitehouse Decl. ¶¶ 3, 9-11; Masur Decl. ¶¶ 3-6, 11.

Docket No. EPA-HQ-OW-2009-0819-4684, further demonstrating that the issue at stake in this case is germane to the organizations' missions.  Many of the Plaintiffs are also petitioners, and respondent-intervenors, in the pending litigation over the ELG Rule.[28]

Finally, neither the claim asserted nor the relief requested requires the participation of individual members of Plaintiffs.  This lawsuit raises pure questions of law, and the court does not need to consider the circumstances of individual members in order to decide the merits or resolve the claim for relief.  *See Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*, 477 U.S. 274, 287–88 (1986) (holding that the participation of individual members was not required, where the lawsuit raised "a pure question of law" as to whether the agency properly interpreted a statute, and the relief requested did not require consideration of the "unique facts" of each member); *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 597 (D.C. Cir. 2015) ("Member participation is not required where a 'suit raises a pure question of law' and neither the claims pursued nor the relief sought require the consideration of the individual circumstances of any aggrieved member of the organization.").

For all of these reasons, Plaintiffs have standing to bring this case.

## II.    EPA FAILED TO SATISFY THE FOUR-PART TEST FOR A STAY UNDER 5 U.S.C. § 705.

In its notice of the Indefinite Stay, EPA did not even mention, much less satisfy, the four-part test for issuing a stay under 5 U.S.C. § 705.  Under this provision of the APA, an agency "may postpone the effective date of action taken by it, pending judicial review" when it "finds that justice so requires."  5 U.S.C. § 705.  As a court in this district has held, "the standard for

---

[28] *See* Opening Brief of Petitioners Environmental Integrity Project, Sierra Club, and Waterkeeper Alliance, Inc., *Sw. Elec. Power Co. v. EPA*, No. 15-60821, ECF Doc. 00513785014 (5th Cir. Dec. 5, 2016); Order, *Sw. Elec. Power Co. v. EPA*, No. 15-60821,Order, ECF Doc. 00513471998 (5th Cir. Apr. 20, 2016) (granting the motion to intervene filed by Sierra Club, Environmental Integrity Project, Waterkeeper Alliance, and Clean Water Action).

[this type of] stay at the agency level is the same as the standard for a stay at the judicial level: each is governed by the four-part preliminary injunction test applied in this Circuit." *Sierra Club v. Jackson*, 833 F. Supp. 2d 11, 30 (D.D.C. 2012).[29] Thus, an agency must base any postponement of the effective date of a rule under 5 U.S.C. § 705 on specific findings that legal challenges to the agency action are likely to succeed on the merits, that there will be irreparable harm absent a stay, that this irreparable harm outweighs the denial of the rule's benefits during the stay, and that the public interest is served by a stay. *Id.*; *cf. League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) ("A party seeking a preliminary injunction must make a 'clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest.'" (quoting *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 505 (D.C. Cir. 2016))).

As the *Jackson* court noted, 833 F. Supp. 2d at 31, the legislative history of the APA indicates that Congress intended 5 U.S.C. § 705 to codify the pre-existing equitable authority of courts and agencies to preserve the status quo:

> This section permits either agencies or courts, if the proper showing be made, to maintain the status quo . . . . The authority granted is equitable and should be used by both agencies and courts to prevent irreparable injury or afford parties an adequate judicial remedy.

Administrative Procedure Act, Pub. L. 1944–46, S. Doc. 248 at 277 (1946) (referring to 5 U.S.C. § 1009(d), the prior version of 5 U.S.C. § 705). Just as a court may stay a rule pending review

---

[29] This holding in *Jackson* that the same standards apply to both agency and judicial stays under Section 705 only applies to stays that postpone the effective date of an action pending judicial review. *Sierra Club v. Jackson*, 833 F. Supp. 2d at 24-25. As discussed below, Section 705 only provides federal agencies with authority to postpone the effective dates of rules that are not yet in effect, and EPA exceeded its authority under Section 705 by issuing the Indefinite Stay of the ELG Rule after its effective date. *See infra* pages 28-30. By contrast, Section 705 provides additional authority to courts; under this provision, courts are authorized not only "to postpone the effective dates of an agency action," but also "to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705.

only if the preliminary injunction factors are met, so, too, must an agency find that the preliminary injunction factors are satisfied before issuing a stay.

Even if the APA itself did not require EPA to satisfy the four-part preliminary injunction test, EPA's past practice has been to consider the preliminary injunction factors when considering a request to stay a rule under 5 U.S.C. § 705.  *See, e.g.*, 76 Fed. Reg. 28,318, 28,326 (May 17, 2011) (in considering a stay request under 5 U.S.C. § 705, "EPA evaluated . . . the merits criteria for granting stays—the likelihood of success on the merits, possibility of irreparable harm to the petition, harm to other parties, and the ultimate public interest"); 76 Fed. Reg. 4780, 4788 (Jan. 26, 2011) (denying a request to stay a rule because the petitioners did not make a strong showing on the merits, did not demonstrate irreparable harm absent a stay, did not consider the possibility of harm to other parties from a stay, and granting a stay would be contrary to the public interest); 75 Fed. Reg. 49,556, 49,563 (Aug. 13, 2010) (concluding that a stay under 5 U.S.C. § 705 was not warranted because there was not a strong likelihood of success in the litigation challenging EPA's endangerment finding, there would be no irreparable harm absent a stay, the rule would have important benefits, and the public interest did not favor a stay). In addition, the EPA Administrator, in an Environmental Appeals Board decision, announced that EPA had to meet the same test as a court would have to meet in order to stay a rule under 5 U.S.C. § 705.  *In re Pub. Serv. Co. of N. H.*, 1 E.A.D. 389 (E.P.A.), 1977 WL 45581, at *2 (1977) (summarizing the four-part test by which a court considers a stay request, and holding that "[t]hese tests are also used by agencies in deciding whether to issue stays of their own orders").[30]

---

[30] The EAB is EPA's supreme adjudicative body.  *See* 57 Fed. Reg. 5320 (Feb. 13, 1992).  EAB decisions represent the position of the EPA Administrator with respect to the matters brought before it and are owed *Chevron* deference.  *See In re Lyon Cty. Landfill, Lynd, Mn.*, 406 F.3d 981, 984 (8th Cir. 2005) ("EAB decisions, however, are formal

In light of EPA's past practice of applying the four-part preliminary injunction test to requests for stays under 5 U.S.C. § 705, EPA was required to acknowledge and justify its departure from the agency's past practice in order to lawfully issue the Indefinite Stay without meeting this standard. *See Encino Motorcars, LLC v. Navarro*, — U.S. —,136 S. Ct. 2117, 2125-26 (2016) (when an agency departs from its prior position, "the agency must at least 'display awareness that it is changing position' and 'show that there are good reasons for the new policy'" (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009))); *FCC v. Fox Television Stations, Inc.*, 556 U.S. at 515 ("[T]he requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position. An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." (emphasis in original)); *Jicarilla Apache Nation v. U.S. Dep't of Interior,* 613 F.3d 1112, 1119 (D.C. Cir. 2010) ("'[r]easoned decision making . . . necessarily requires the agency to acknowledge and provide an adequate explanation for its departure from established precedent,' and an agency that neglects to do so acts arbitrarily and capriciously" (quoting *Dillmon v. Nat'l Transp. Safety Bd.*, 588 F.3d 1085, 1089-90 (D.C. Cir. 2009))).

Here, EPA's notice of the Indefinite Stay does not mention, much less consider, any of the preliminary injunction factors, by which "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20

---

adjudications consistent with the Administrative Procedure Act . . . and due Chevron deference."); *see also Resisting Envtl. Destruction on Indigenous Lands, REDOIL v. U.S. E.P.A.*, 716 F.3d 1155, 1161 (9th Cir. 2013) (collecting cases from other Circuit Courts).

(2008); *see also John Doe Co. v. Consumer Fin. Prot. Bureau*, 849 F.3d 1129, 1131 (D.C. Cir.

2017).  For the first, third, and fourth factors, the Indefinite Stay notice makes no showing that

industry is likely to prevail on the merits of its challenges to the final ELG Rule in the Fifth

Circuit; the notice does not discuss the harm to others from granting the stay; and the notice does

not address the public interest.  *See* 82 Fed. Reg. at 19,005.  Nor is there any indication

elsewhere in the administrative record that EPA considered these factors prior to issuing the

Indefinite Stay.

  For the fourth factor, whether parties challenging the rule will suffer irreparable harm in

the absence of a stay, EPA's notice of the Indefinite Stay makes no express finding that a stay is

required to prevent irreparable harm.  While the notice contains a single sentence mentioning the

"capital expenditures" facilities will need to make to comply with the ELG Rule, the notice does

not claim that such costs constitute irreparable harm.  *Id*.  A preliminary injunction must be

denied if the movant does not demonstrate irreparable harm.  *Fraternal Order of Police Library

of Congress Labor Comm. v. Library of Congress*, 639 F. Supp. 2d 20, 24 (D.D.C. 2009)

("Considering that 'the basis of injunctive relief in the federal courts has always been irreparable

harm,' . . . a court may deny a motion for a preliminary injunction and not address the remaining

three factors where a plaintiff fails to establish irreparable harm." (internal citation omitted)).

EPA was required to find that in the absence of a stay, companies would suffer irreparable harm

during the pendency of judicial review, *i.e.*, during the time period between application for the

stay and issuance of the Fifth Circuit's decision in challenges to the ELG Rule.  *See Chaplaincy

of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) ("The moving party

must show '[t]he injury complained of is of such imminence that there is a clear and present need

for equitable relief to prevent irreparable harm.'" (emphasis in original) (quoting *Wisc. Gas Co.*

*v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985))).  EPA's notice of the Indefinite Stay provides no

evidence that companies will suffer irreparable harm during the pendency of judicial review.

 Moreover, based on EPA's own statements in the Indefinite Stay notice, the Agency

could not find that the four preliminary injunction factors are met here, because the Indefinite

Stay notice declares that "EPA is not making any concession of error with respect to the [ELG]

rulemaking."  82 Fed. Reg. at 19,005.  EPA's claim that it has made no errors in the ELG

rulemaking necessarily means that EPA cannot make the first required finding for a stay, that the

parties seeking a stay are "likely to succeed on the merits" of their challenges to the ELG Rule,

*Winter*, 555 U.S. at 20.  Thus, EPA could not possibly have satisfied the four-part test for a stay

under 5 U.S.C. § 705.

 In sum, EPA in its notice of the Indefinite Stay fails to make any of the four findings

necessary to stay a rule under 5 U.S.C. § 705.  The notice ignores both judicial precedent in

*Sierra Club v. Jackson*, as well as the agency's well-established practice in other rules, that EPA

must find that the four preliminary injunction factors are satisfied in order to stay a rule under 5

U.S.C. § 705.  EPA's Indefinite Stay notice "provides no justification whatsoever—much less

reasoned decisionmaking—for its departure from prior precedents, and the courts in this Circuit

'have never approved any agency's decision to completely ignore relevant precedent.'"  *Sierra*

*Club v. Jackson*, 833 F. Supp. 2d at 32 (quoting *Jicarilla Apache Nation*, 613 F.3d at 1120).  Nor

does anything else in EPA's administrative record satisfy this standard.  What is more, by "not

making any concession of error with respect to the [ELG] rulemaking," 82 Fed. Reg. at 19,005,

EPA could not possibly satisfy the test for a stay.  Having failed to make findings in the

Indefinite Stay notice that the four preliminary injunction factors are met, EPA lacked authority

to stay the ELG Rule under 5 U.S.C. § 705.

### III.    EPA LACKS AUTHORITY TO STAY THE ELG RULE FOR PURPOSES OF RECONSIDERATION RATHER THAN JUDICIAL REVIEW.

Although EPA purports to rely on 5 U.S.C. § 705 to stay the ELG Rule pending judicial review, the text of EPA's notice of the Indefinite Stay indicates that the real reason for the Stay is to reconsider the Rule.  *See* 82 Fed. Reg. at 19,005-06 ("While EPA is not making any concession of error with respect to the rulemaking, the far-ranging issues contained in the reconsideration petitions warrant careful and considerate review of the Rule.").  This is an impermissible "sl[e]ight-of-hand."  *Sierra Club v. Jackson*, 833 F. Supp. 2d at 34.  The plain meaning of 5 U.S.C. § 705 authorizes an agency to "postpone the effective date of action taken by it *pending judicial review*" (emphasis added).  It does not authorize an agency to postpone the effective date pending *reconsideration*.  This Circuit has clearly differentiated between the two grounds for a stay.  *In re GTE Serv. Corp.*, 762 F.2d 1024, 1026 (D.C. Cir. 1985) (citing Administrative Procedure Act § 10(d), 5 U.S.C. § 705); *see also Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 562 (D.C. Cir. 2015) (Kavanaugh, J., dissenting) (contrasting the Clean Air Act provision authorizing "stays pending agency reconsideration" with "Section 705 of the APA," which "authorizes courts to stay agency rules pending judicial review").

In the Clean Water Act, Congress did not grant EPA the authority to stay rules pending reconsideration.[31]  This is meaningful because Congress has expressly granted that authority to EPA in other statutes.  For example, the Clean Air Act provides that "[t]he effectiveness of the rule may be stayed during such reconsideration, however, by the Administrator or the court for a

---

[31] After issuing its notice of the Indefinite Stay, EPA issued a new notice in which it proposed to stay the compliance deadlines in the ELG Rule under Clean Water Act authority.  82 Fed. Reg. at 26,017.  Tellingly, however, the new notice fails to cite any provision in the Clean Water Act authorizing a stay of compliance deadlines pending reconsideration.  On the contrary, Section 301 of the Clean Water Act provides that "compliance with effluent limitations" such as those promulgated in the ELG Rule must be achieved "as expeditiously as practicable, but in no case later than three years after the date such limitations are promulgated."  33 U.S.C. § 1311(b)(2).  The Clean Water Act includes no provisions authorizing postponement or reconsideration of effluent limitations once established.

period not to exceed three months."  42 U.S.C. § 7607(d)(7)(B).  Nor does the APA authorize an agency to stay a rule merely because the agency is reconsidering it.  Congress' express inclusion of language in the Clean Air Act authorizing stays pending reconsideration, while not providing any such authority in either the Clean Water Act or the APA, further underscores that EPA was not authorized to issue the Indefinite Stay under either statute.  *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006) ("We normally presume that, where words differ as they differ here, 'Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983))).

Given that there is no statutory authority for EPA to stay the ELG Rule compliance deadlines pending reconsideration, the only possible authority for the Stay, 5 U.S.C. § 705, is limited to stays pending judicial review.  Where "EPA seeks to justify a stay of its rules 'pending judicial review,' the agency must have articulated, at a minimum, a rational connection between its stay and the underlying litigation in the court of appeals."  *Sierra Club v. Jackson*, 833 F. Supp. 2d at 34.

Here, EPA's notice of the Indefinite Stay fails to draw a rational connection between the stay and judicial review of the final ELG Rule in the Fifth Circuit.  The notice explains that "after considering the objections raised in the reconsideration petitions, the Administrator determined that it is appropriate and in the public interest to reconsider the Rule."  82 Fed. Reg. at 19,005.  EPA continues discussing its intention to reconsider the ELG Rule, but mentions the pending litigation in the Fifth Circuit over the ELG Rule only in passing:

> In light of the capital expenditures that facilities incurring costs under the Rule will need to undertake in order to meet the compliance deadlines for the new, more stringent limitations and standards in the Rule—which are as early as November 1, 2018, for direct dischargers and by November 1, 2018, for indirect dischargers—the Agency finds that justice requires it to postpone the compliance dates of the Rule that have not yet passed, pending judicial review. See 80 FR

67838, 67863–67868 (Nov. 3, 2015) (discussion of costs of the Rule). This will
preserve the regulatory status quo with respect to wastestreams subject to the
Rule's new, and more stringent, limitations and standards, while the litigation is
pending and the reconsideration is underway.

*Id.*

As the passage above indicates, the Indefinite Stay notice fails to provide any justification

for the stay that is rooted in the Fifth Circuit litigation over the final ELG Rule.  In the notice,

EPA "makes no mention of any concern about the substantive merit of its rules," *Sierra Club v.

Jackson*, 833 F. Supp. 2d at 34.  To the contrary, the notice provides that "EPA is not making

any concession of error with respect to the [ELG] rulemaking."  82 Fed. Reg. at 19,005.

Nor does EPA's administrative record supply the missing rational connection between

the pending Fifth Circuit litigation and the Indefinite Stay.  Rather, the only documents in EPA's

administrative record which were generated after the ELG Rule was issued are the petitions for

reconsideration submitted by UWAG and SBA, materials submitted by UWAG in support of its

petition for reconsideration, and EPA's letter in response to the petitions.  ECF Doc. 19-2, ROA

Doc. Nos. 12844-49.  EPA has not included in its administrative record any of the filings in the

Fifth Circuit litigation, nor any other materials indicating a connection between the Indefinite

Stay and the pending judicial review of the ELG Rule.

Furthermore, two days after EPA issued the Indefinite Stay, EPA successfully moved the

Fifth Circuit to hold in abeyance the pending litigation over the merits of the ELG Rule.  *See*

EPA Motion to Hold Proceedings in Abeyance While the Agency Undertakes Reconsideration,

*Sw. Elec. Power Co. v. EPA*, No. 15-60821, ECF Doc. 00513952863 (5th Cir. Apr. 14, 2017);

Order, *Sw. Elec. Power Co. v. EPA*, No. 15-60821, ECF Doc. 00513964356 (5th Cir. Apr. 24,

2017).  This directly undermines the notion that EPA stayed the Rule to allow the Fifth Circuit to

resolve challenges to the Rule.

EPA stayed the rule in order to reconsider the rule.  This court, in a strikingly similar situation, found this to be impermissible: "Although EPA paid lip service to the pending litigation in the court of appeals, its stated purpose" in issuing the Indefinite Stay "was to delay" the ELG Rule compliance deadlines "pending reconsideration."  *Sierra Club v. Jackson*, 833 F. Supp. 2d at 34.  Given that EPA failed to provide a rational connection between the stay and the Fifth Circuit litigation challenging the final ELG Rule, EPA lacked authority to stay the compliance deadlines in the ELG Rule under 5 U.S.C. § 705.

## IV.    THE APA DOES NOT AUTHORIZE EPA TO "POSTPONE THE EFFECTIVE DATE" OF A RULE THAT IS ALREADY IN EFFECT.

The ELG Rule became effective on January 4, 2016, 80 Fed. Reg. at 67,838, over sixteen months before EPA issued the Indefinite Stay.  As such, EPA lacked authority to issue the Indefinite Stay under 5 U.S.C. § 705, because that provision only allows agencies to "postpone the effective date" of a rule before it takes effect.  By its plain meaning, Section 705 does not allow an agency to stay the effective date of a rule after it has become effective because the statute uses the term "postpone," which means "to put off to a later time."  *Postpone Definition*, Merriam-Webster, *available at* https://www.merriam-webster.com/dictionary/postpone (last visited June 14, 2017).  "It is implicit in this definition that one can only postpone something that has not yet occurred.  If a wedding occurs on September 2, one cannot 'postpone' the wedding until September 30 on September 5."  *Merriweather v. Sherwood*, 235 F. Supp. 2d 339, 342 (S.D.N.Y. 2002) (construing Prison Litigation Reform Act provision authorizing courts to "postpone the effective date of an automatic stay" (quoting 18 U.S.C. § 3626(e)(3)).  Accordingly, under the plain language of Section 705, EPA lacked the authority in April 2017 to postpone indefinitely the effective date of the ELG Rule, which went into effect in January 2016.  *See, e.g.*, *Setser v. United States*, 566 U.S. 231, 239 (2012) (a court must "give effect . . . to every

clause and word" of a statute that it interprets (quoting *United States v. Menasche*, 348 U.S. 528, 538-39 (1955))).

Consistent with Section 705's plain meaning, the D.C. Circuit has held (in an unpublished decision) that this provision only "permits an agency to postpone the effective date of a not yet effective rule, pending judicial review.  It does not permit an agency to suspend without notice and comment a promulgated rule."  *Safety-Kleen Corp. v. EPA*, No. 92-1629, 1996 U.S. App. LEXIS 2324, at *2-3 (D.C. Cir. Jan. 19, 1996) (per curiam).

In addition, EPA has in the past interpreted Section 705 not to authorize the Agency to postpone the effective date of a rule whose effective date had already passed.  *See* 76 Fed. Reg. at 28,326 (finding that "the effective date" of the rule "ha[d] already passed and thus a stay under APA section 705 [wa]s not appropriate").[32]  As noted above, EPA cannot depart from its prior statutory interpretations *sub silentio*, but must instead provide a reasoned explanation for any change in position.  *See supra* at 22 (citing *Encino Motorcars, LLC*, 136 S. Ct. at 2125-26; *Jicarilla Apache Nation*, 613 F.3d at 1119).

Although EPA does provide a brief explanation in its notice of the Indefinite Stay for its reinterpretation of 5 U.S.C. § 705, EPA failed to satisfy the "reasoned explanation" standard.  The notice asserts that EPA has authority to stay the ELG Rule's future compliance deadlines because they "have not yet passed, and they are within the meaning of the term 'effective date' as that term is used in Section 705 of the APA."  82 Fed. Reg. at 19,005.  Yet this is directly inconsistent with EPA's pronouncement in the ELG Rule itself that its effective date is January 4, 2016.  80 Fed. Reg. at 67,838.  Nor does EPA provide any support for its suggestion

---

[32] *See also* 76 Fed. Reg. 4780, 4788 (Jan. 26, 2011) ("[I]t is not clear whether EPA would have authority under APA section 705 to stay an agency action that has already gone into effect.  Postponing an effective date implies action before the effective date arrives."); 75 Fed. Reg. 49,556, 49,563 (Aug. 13, 2010) (same).

that the term "effective date" in Section 705 can be read broadly to apply both to a rule's initial effective date and to any other compliance dates established in the rule.  On the contrary, Section 705 uses the term "effective date" in the singular, and in its past practice EPA has assumed that for purposes of Section 705, each agency action has only one effective date.  *See, e.g.*, 76 Fed. Reg. at 28,326; *see also* 61 Fed. Reg. 28,508, 28,508 (June 5, 1996) (discussing EPA actions to postpone the effective date of the rule under Section 705 and distinguishing the effective date of the rule from "the compliance dates by which different requirements of the final rule must be met").  The Indefinite Stay notice's discussion of its proffered interpretation of the term "effective date" in Section 705 fails to explain these departures from the text of the statute, the Agency's past practice, and the ELG Rule itself, and therefore cannot constitute a reasoned explanation for EPA's reinterpretation of Section 705 as authorizing the Indefinite Stay.  *See Encino Motorcars, LLC*, 136 S. Ct. at 2125-26; *Jicarilla Apache Nation*, 613 F.3d at 1119.[33]

---

[33] Similarly, EPA also lacked authority to issue the Indefinite Stay under 5 U.S.C. § 705 because it applied the Indefinite Stay selectively to portions of the ELG Rule, while leaving others in effect.  Specifically, EPA postponed the compliance deadlines for "the new, more stringent limitations and standards in the Rule," including those affecting the three largest wastestreams of fly ash and bottom ash transport water, and flue gas desulfurization ("scrubber") wastewater.  *See* 82 Fed. Reg. at 19,006.  EPA did not postpone compliance requirements for leachate, or so-called "legacy wastewater," both of which were exempted in the ELG Rule from new, more stringent standards.  *See id.* (listing the provisions of the ELG Rule that are stayed, but omitting 40 C.F.R. § 423.13(l), which applies to leachate, and 40 C.F.R. § 423.13(g)(1)(ii), (h)(1)(ii), (i)(1)(ii), (j)(1)(ii), (k)(1)(ii), which exempts legacy wastewater from more stringent standards).  As a consequence of EPA's failure to set stringent, technology-based standards for leachate and legacy wastewater, permitting authorities are no longer required to undertake a case-by-case analysis of the best available technology to control pollution in these wastestreams.  Thus, allowing the leachate and legacy wastewater exemptions to go into effect precludes more protective technology-based effluent limits from being set in individual NPDES permits.  *See* 40 C.F.R. § 125.3(c)(2) (technology-based limits may be imposed using the permit writer's best professional judgment only "to the extent that EPA-promulgated effluent limitations are inapplicable.").  Because the plain language of Section 705 provides EPA with authority only to "postpone the effective date" (used in the singular) of a rule, 5 U.S.C. § 705, and because EPA has interpreted this language to mean that each of its actions has a single effective date (distinct from any future compliance dates), *see supra* page 29 n.32 and accompanying text, EPA cannot now claim authority under Section 705 to select certain ELG Rule compliance deadlines to be "postponed" while leaving others in effect.    Nor does EPA provide any reasoned explanation in its notice of the Indefinite Stay for this departure from its past practice.

**V.      EPA FAILED TO CONSIDER AN IMPORTANT ASPECT OF THE PROBLEM BY FAILING TO CONSIDER THE BENEFITS TO THE PUBLIC OF THE ELG RULE.**

The Indefinite Stay must also be vacated as arbitrary and capricious because EPA failed to consider all of the relevant factors – including both the costs and the benefits of the ELG Rule – before issuing the Indefinite Stay.  "[I]n making the factual inquiry concerning whether an agency decision was 'arbitrary or capricious,' the reviewing court 'must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'"  *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989) (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)).  "It is a fundamental principle of administrative law that federal 'administrative agencies are required to engage in reasoned decisionmaking.'"  *Mingo Logan Coal Co. v. EPA*, 829 F.3d 710, 732 (D.C. Cir. 2016) (quoting *Michigan v. EPA*, — U.S. — , 135 S. Ct. 2699, 2706 (2015)).  "Where the agency has failed to provide a reasoned explanation, or where the record belies the agency's conclusion, we must undo its action."  *BellSouth Corp. v. FCC*, 162 F.3d 1215, 1222 (D.C. Cir. 1999).

The harm that would occur from an agency rule – including a rule postponing regulatory deadlines, and benefits to the public of compliance with those deadlines – is an important aspect of the problem, and must be considered in order for the rule to survive judicial review.  *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 ("An agency rule would be arbitrary and capricious if the agency has . . . entirely failed to consider an important aspect of the problem."); *see also Michigan v. EPA*, 135 S. Ct. at 2707 ("[R]easonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages of agency decisions." (emphasis in original)).

Here, in its notice of the Indefinite Stay, EPA considered only the advantages to industry of staying the ELG Rule.  *See* 82 Fed. Reg. at 19,005 (discussing the capital costs industry would incur to comply with the ELG Rule).  EPA ignored completely the disadvantages of staying the

ELG Rule, namely, that staying the Rule would delay the benefits of implementing the ELG Rule. *See id.* (incorporating no discussion of the ELG Rule's benefits, including its public health and environmental benefits). Nor does any other document in EPA's administrative record consider any of the harms to the public that would result from the Indefinite Stay's delay of the ELG Rule's benefits. It violates the fundamental definition of reasoned agency decisionmaking required by the APA – not to mention common sense – for an agency to consider only the advantages of a particular course of action and not its disadvantages. *See Michigan v. EPA*, 135 S. Ct. at 2707; *see also Ctr. for Sci. in the Pub. Interest v. Dep't of the Treasury*, 573 F. Supp. 1168, 1176-77 (D.D.C. 1983), *appeal dismissed*, 727 F.2d 1161 (D.C. Cir. 1984) ("Treasury has not met its burden of providing a reasoned explanation for its decision on the ground that the costs of the regulations outweigh the benefits.").

EPA's failure to consider the disadvantages of staying the ELG Rule is particularly egregious given EPA's own findings in the ELG rulemaking that implementing the Rule would yield significant benefits. Given that the power plant industry is the largest single source of toxic water pollution in the country, *Final Environmental Assessment* at 3-15 (Table 3-3), it is unsurprising that EPA previously found that implementing the ELG Rule would dramatically reduce the amount of lead, mercury, and other toxics dumped into waterbodies. *Id.* at 7-7 (Table 7-3). In 2015, EPA further found that by reducing this water pollution, the ELG Rule will prevent cases of cancer, cardiovascular disease, and other diseases, reduce the amount of money spent on environmental cleanups, and improve water quality across the country. *Final Benefit & Cost Analysis* at 2-1, 2-3 to 2-7; Declaration of Elizabeth Stanton, ¶ 12, Attached as Exhibit 19

("Stanton Decl."); Declaration of Barbara Gottlieb ¶¶ 4-26, Attached as Exhibit 20 ("Gottlieb Decl.").[34]

EPA concluded that implementation of the ELG Rule will deliver between $451 and $566 million worth of benefits every year.  80 Fed. Reg. at 67,841-42.[35]  EPA expects that in the first five years of implementation, the Rule will produce a minimum of $2.7 billion in benefits to society.[36]  Moreover, EPA was unable to quantify or monetize all of the benefits of the Rule, and therefore the true dollar amount of the benefits is higher than EPA was able to estimate.  *Id.* at 2-13 to 2-15 (Table 2-1), 11-1; Stanton Decl. ¶¶ 13-14.

Given the extensive evidence that EPA itself produced on the benefits of implementing the ELG Rule, it was arbitrary and capricious for EPA to stay the Rule without considering that the Stay will delay the benefits of the ELG Rule.  By failing to give any consideration to the disadvantages of staying the ELG Rule, EPA ran afoul of the principle that "reasonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages of agency decisions," *Michigan v. EPA*, 135 S. Ct. at 2707 (emphasis in original), and EPA failed to consider an important aspect of whether to issue a stay, *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.  As a result, the Indefinite Stay is arbitrary and capricious and must be vacated.

---

[34] While EPA has not yet filed the administrative record, the declarations of Barbara Gottlieb and Elizabeth Stanton will not be in the record, as they were developed for this case.  A court can consider extra-record evidence when "the agency failed to examine all relevant factors or to adequately explain its grounds for decision."  *IMS, P.C. v. Alvarez*, 129 F.3d 618, 624 (D.C. Cir. 1997); *see also Nat'l Mining Ass'n v. Jackson*, 856 F. Supp. 2d 150, 158 (D.D.C. 2012) (finding that although the administrative record was entirely bare as to the issue of how the EPA had applied the challenged Final Guidance); *United Student Aid Funds, Inc. v. Devos*, No. 15-CV-01137 (APM), 2017 WL 728044, at *3 (D.D.C. Feb. 23, 2017) (finding that it could not, on the administrative record alone, determine whether the agency had complied with its procedural obligations under the APA).  Here, EPA failed to examine all the relevant factors before it issued the Indefinite Stay because it did not consider the benefits of the ELG rule discussed in Statement of Facts, Section IV, *supra*.

[35] As noted above, *supra* note 7, this estimate of the ELG Rule's benefits is based on a 3% discount rate.

[36] Stanton Decl. ¶ 11.

VI.    **EPA'S FAILURE TO PROVIDE PRIOR NOTICE AND AN OPPORTUNITY TO COMMENT VIOLATES THE APA.**

The Administrative Procedure Act requires agencies engaged in rulemaking to publish notice of the proposed rule in the Federal Register and provide the public with an opportunity to comment on the proposal. *See* 5 U.S.C. § 553(b)-(c). "Rule making" is defined as the "process for formulating, amending, or repealing a rule." *Id*. § 551(5). The APA defines a "rule" as "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law . . . ." *Id*. § 551(4).

Here, EPA issued an indefinite "postponement of the compliance dates that have not yet passed." 82 Fed. Reg. at 19,006. This is a "rule" within the meaning of the APA, *see* 5 U.S.C. § 551(4), as the Stay is applicable to all entities subject to the ELG Rule, and is designed to implement and prescribe law by indefinitely suspending certain compliance deadlines in the ELG Rule.

An agency's repeal of a rule is subject to the APA's notice and comment requirements. *See* 5 U.S.C. § 551(5) ("'rule making' means agency process for formulating, amending, or *repealing* a rule") (emphasis added); *Nat'l Treasury Emps. Union v. Cornelius*, 617 F. Supp. 365, 372 (D.D.C. 1985) ("The Court finds that OPM's failure to provide notice and an opportunity to comment in its repeal of these regulations is inconsistent with the requirements of the APA."). This Circuit has held that the indefinite suspension of compliance with a rule is tantamount to repeal of a rule, *Public Citizen v. Steed*, 733 F.2d 93, 98 (D.C. Cir. 1984), and since an agency must provide prior notice and comment before it repeals a rule, it must do the same before indefinitely suspending a rule. *See Envtl. Def. Fund, Inc. v. Gorsuch*, 713 F.2d 802, 816 (D.C. Cir. 1983) ("[W]e hold that an agency decision which effectively suspends the implementation of important and duly promulgated standards for two classes of hazardous waste

34

management facilities constitutes rulemaking subject to notice and comment requirements of 5 U.S.C. § 553."); *Council of S. Mountains, Inc. v. Donovan*, 653 F.2d 573, 580 (D.C. Cir. 1981) (in reviewing a rule postponing the compliance deadlines of a final rule, noting that "[a]t oral argument the Government did not dispute that the December 5 order was the type of agency action ordinarily subject to the notice-and-comment procedure")[37]; *see also Safety-Kleen Corp.*, 1996 U.S. App. LEXIS 2324, at *2-3 (Section 705 "does not permit an agency to suspend without notice and comment a promulgated rule.").

Courts in other circuits agree that the indefinite suspension of a final rule is itself a rule, subject to the APA's notice and comment requirements. *See Nat. Res. Def. Council, Inc. v. Abraham*, 355 F.3d 179, 206 (2d Cir. 2004) ("Therefore, because the February 2 delay was promulgated without complying with the APA's notice-and-comment requirements, and because the final rule failed to meet any of the exceptions to those requirements, it was an invalid rule."); *Nat. Res. Def. Council, Inc. v. EPA*, 683 F.2d 752, 767 (3d Cir. 1982) ("We have ruled that the indefinite postponement of the effective date of the amendments required notice and comment procedures prior to becoming effective . . . ."); *Ranchers Cattlemen Action Legal Fund v. USDA*, 566 F. Supp. 2d 995, 1004 (D.S.D. 2008) ("The effective date of a rule generally is more than procedural and its suspension or delay usually is subject to rulemaking.").  The Third Circuit explained that:

> If the effective date were not "part of an agency statement" such that material alterations in that date would be subject to the rulemaking provisions of the APA, it would mean that an agency could guide a future rule through the rulemaking process, promulgate a final rule, and then effectively repeal it, simply by indefinitely postponing its operative date. The APA specifically provides that the

---

[37] The Court ultimately upheld the postponement of the compliance dates, but on the basis that the "good cause" exception applied.  As explained below, EPA cannot avail itself of the "good cause" exception here, because it failed to make any findings in its notice of the Indefinite Stay that there was good cause to dispense with notice and comment.

> repeal of a rule is rulemaking subject to rulemaking procedures. Thus, a holding that EPA's action here was not a rule subject to the rulemaking procedure of the APA would create a contradiction in the statute where there need be no contradiction: the statute would provide that the repeal of a rule requires a rulemaking proceeding, but the agency could (albeit indirectly) repeal a rule simply by eliminating (or indefinitely postponing) its effective date, thereby accomplishing without rulemaking something for which the statute requires a rulemaking proceeding. By treating the indefinite postponement of the effective date as a rule for APA purposes, it is possible to avoid such an anomalous result.

*Nat. Res. Def. Council, Inc.*, 683 F.2d at 761.  "*Natural Resources* and *Council of the Southern Mountains* stand for the proposition that an agency action which has the effect of suspending a duly promulgated regulation is normally subject to APA rulemaking requirements."  *Envtl. Def. Fund, Inc. v. Gorsuch*, 713 F.2d at 816.

While the APA contains limited exceptions to the notice and comment requirements, none of the exceptions applies here.  The APA exempts "interpretive rules" or "general statements of policy" from the notice and comment requirements that apply to legislative rules. 5 U.S.C. § 553(b)(3)(A), (d)(2).  "A rule is legislative if it supplements a statute, adopts a new position inconsistent with existing regulations, or otherwise effects a substantive change in existing law or policy."  *Mendoza v. Perez*, 754 F.3d 1002, 1021 (D.C. Cir. 2014).  "The practical question inherent in the distinction between legislative and interpretive regulations is whether the new rule effects 'a substantive regulatory change' to the statutory or regulatory regime."  *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 653 F.3d 1, 6–7 (D.C. Cir. 2011) (quoting *U.S. Telecom Ass'n v. FCC*, 400 F.3d 29, 35 (D.C. Cir. 2005)).

The Indefinite Stay effects a substantive regulatory change by indefinitely suspending the compliance deadline for certain requirements of the ELG Rule.  82 Fed. Reg. at 19,006 (issuing a "postponement of the compliance dates that have not yet passed" for certain wastestreams).  The postponement of compliance dates "impose[s] obligations" and "produce[s] . . . significant

effects on private interests," *Batterton v. Marshall*, 648 F.2d 694, 701–02 (D.C. Cir. 1980), and

is therefore a legislative rule for which the notice and comment requirements apply. *See also*

*Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1045 (D.C. Cir. 1987) (noting that "'legislative rules'

are those which create law, usually implementary to an existing law" (quoting *Gibson Wine Co.*

*v. Snyder*, 194 F.2d 329, 331 (D.C. Cir. 1952))).

For similar reasons, the Indefinite Stay does not fall within the exemption for a rule of

"agency organization, procedure, or practice," 5 U.S.C. § 553(b)(3)(A), because the Indefinite

Stay affects the deadlines by which regulated power plants must reduce pollution under the ELG

Rule. *See Batterton*, 648 F.2d at 707 (noting that "this exception was provided to ensure that

agencies retain latitude in organizing their internal operations" and "covers agency actions that

do not themselves alter the rights or interests of parties").

While the APA contains a "good cause" exception to the notice and comment

requirements, the exceptions applies only if the "agency for good cause finds (*and incorporates*

*the finding and a brief statement of reasons therefor in the rules issued*) that notice and public

procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C.

§ 553(b)(3)(B) (emphasis added). Here, EPA's notice of the Indefinite Stay does not contain any

such finding and statement of reasons for failing to provide prior notice and an opportunity to

comment. Thus, EPA's failure to comply with the notice and comment requirements cannot be

excused on the basis of the good cause exception, which is "narrowly construed and only

reluctantly countenanced." *N.J. Dep't of Envtl. Protection v. EPA*, 626 F.2d 1038, 1045 (D.C.

Cir. 1980).

Moreover, there were no practical impediments to EPA providing prior notice and an

opportunity to comment on the Indefinite Stay. EPA issued the final ELG Rule on November 3,

37

2015.  80 Fed. Reg. 67,838.  The effective date of the ELG Rule was January 4, 2016.  *Id.*  EPA

issued the Indefinite Stay on April 25, 2017, 82 Fed. Reg. 19,005, which was more than a year

after the effective date of the ELG Rule had passed.  Given that EPA purported to postpone the

effective date of certain requirements long after the effective date had passed, there was no

practical reason EPA could not have complied with the notice and comment requirements of the

APA.

      After this lawsuit was filed, EPA initiated a new rulemaking in which it has proposed to

stay the ELG Rule.  82 Fed. Reg. 26,017.  EPA's new proposed action has not cured EPA's

failure to provide for notice and comment on the Indefinite Stay, for several reasons.  The

Indefinite Stay is a final agency action that became effective immediately upon publication and

is causing harm now.  The legal defects in the final Indefinite Stay cannot be cured by a

proposed rule, such as the new proposed stay, which has no force of law.

      Even a new, final stay, issued after notice and comment, would not cure EPA's violation

in issuing the Indefinite Stay.  This Circuit "place[s] the burden on the agency to make a

compelling showing that the defects of its earlier notice were cured by the later one" by proving

that the agency retained an open mind during the subsequent rulemaking after it issued the

original rule without notice and comment.  *Advocates for Highway & Auto Safety v. Fed.

Highway Admin.*, 28 F.3d 1288, 1292 (D.C. Cir. 1994); *see also Nat. Res. Def. Council, Inc.*, 683

F.2d at 768 (a proposal for further postponement cannot "substitute" for "procedures in

connection with an initial postponement," because that would allow EPA to circumvent the

notice-and-comment requirement to seek public comments on its proposal prior to

promulgation); *U.S. Steel Corp. v. EPA*, 595 F.2d 207, 214 (5th Cir. 1979) (vacating and

remanding EPA rule promulgated without notice and comment, based on finding that post-

promulgation comment period was not an adequate substitute for comment before promulgation). Moreover, it is unclear whether the new stay is intended to supersede immediately the current Indefinite Stay, or whether it is intended to replace the current Stay only if the Fifth Circuit litigation ends. *See* 82 Fed. Reg. at 26,018 ("Because Section 705 of the APA authorizes an Agency to postpone the effective date of an action pending judicial review, EPA is undertaking this notice-and-comment rulemaking to postpone certain compliance dates in the rule in the event that the litigation ends, and while the Agency is undertaking reconsideration."). Similarly, as the new stay is merely a proposal, it is uncertain if, and, when, EPA will issue a final rule.[38] EPA may decide not to finalize some or all of the proposed rule; in that event, the Indefinite Stay would remain in force, and EPA would still have failed to provide for notice and an opportunity to comment on the Indefinite Stay. For all these reasons, EPA has not cured its violation of the notice and comment requirements.

In sum, in promulgating the Indefinite Stay, EPA issued a legislative rule, and the APA required prior notice of, and an opportunity to comment on, the proposed rule. EPA failed to provide the required notice and comment opportunity, and thus the Indefinite Stay violates the APA, 5 U.S.C. § 553(b)-(c).

**VII.      THE COURT SHOULD VACATE WITH INSTRUCTIONS.**

   **A.  The Court Should Vacate the Indefinite Stay.**

For the reasons explained above, the Indefinite Stay is both contrary to law, because EPA lacks authority to issue the stay under 5 U.S.C. § 705, and is arbitrary and capricious. The APA provides that "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings,

---

[38] The new, proposed stay would be unlawful if finalized in its present form, because neither the APA nor the Clean Water Act grants EPA authority to stay the ELGs pending reconsideration. Tellingly, the proposed rule fails to cite any statutory authority for the proposed stay—because there is none. *See* 82 Fed. Reg. 26,017.

and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law."  5 U.S.C. § 706(2).  In keeping with the statutory language, "vacatur is the

normal remedy" when a court identifies a legal deficiency in an agency action.  *Allina Health*

*Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014).  Moreover, because EPA issued the

Indefinite Stay without providing prior notice, and an opportunity to comment, as required by 5

U.S.C. § 553(b)-(c), this "deficient notice is a 'fundamental flaw' that almost always requires

vacatur."  *Id.* (quoting *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 199 (D.C. Cir.

2009)).

　　While courts can remand a flawed rule without vacatur under certain circumstances,

those circumstances are not present here.  This Circuit has "frequently remanded without

vacating when a rule's defects are curable and 'where vacatur would at least temporarily defeat .

. . the enhanced protection of the environmental values covered by [the EPA rule at issue].'"

*U.S. Sugar Corp. v. EPA*, 844 F.3d 268, 270 (D.C. Cir. 2016) (quoting *North Carolina v. EPA*,

550 F.3d 1176, 1178 (D.C. Cir. 2008)).  Here, many of the Stay's defects are not curable.  For

example, EPA violated the APA by purporting to stay the ELG Rule after its effective date had

passed, and EPA cannot cure this defect because neither the APA nor the Clean Water Act

authorizes EPA to stay a rule when the effective date of the rule has passed.  Furthermore,

vacatur would not frustrate the environmental goals of the ELG Rule.  To the contrary, vacating

the Indefinite Stay, so that the ELG Rule is in effect and must be implemented, would further the

ELG Rule's goal of reducing toxic water pollution from the power plant industry.  For these

reasons, the Court should vacate the Indefinite Stay.

**B.  In Addition to Vacating the Rule, the Court Should Order EPA to Send Letters to Utilities and States.**

In addition to vacating the Indefinite Stay, the Court should grant further relief, to cure the harm caused by EPA in delaying implementation of the ELG Rule.  In fashioning a remedy, "the district court has substantial ability to order that relief which is necessary to cure the appellants' legal transgressions."  *Cobell v. Norton*, 240 F.3d 1081, 1107 (D.C. Cir. 2001). "[C]ourts are presumed to possess the full range of remedial powers—legal as well as equitable—unless Congress has expressly restricted their exercise."  *Crocker v. Piedmont Aviation, Inc*., 49 F.3d 735, 749 (D.C. Cir. 1995); *see also Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 69 (1992) ("[I]f a right of action exists to enforce a federal right and Congress is silent on the question of remedies, a federal court may order any appropriate relief.").  Here, Plaintiffs sue under the APA, which does not expressly restrict the court's remedial powers.

In this case, Defendant EPA has violated the APA and harmed Plaintiffs' members by unlawfully delaying implementation of the ELG Rule.  Even before issuing the Indefinite Stay, EPA sent letters to utilities and states designed to stall implementation of the ELG Rule.  On April 12, EPA sent a letter to UWAG and the SBA indicating that EPA intended to stay certain of the ELG Rule's compliance deadlines.[39]  The day before, EPA sent letters to each state in which EPA reminded state permitting authorities of their flexibility to set compliance dates for the ELGs many years in the future.[40]  The letters to the states announced that EPA "intends to

---

[39] Letter from E. Scott Pruitt, EPA Administrator, to Harry M. Johnson and Major Clark, at 1 (Apr. 12, 2017), *available at* https://www.epa.gov/sites/production/files/2017-04/documents/steam-electric-elg_uwag-sba-petition_epa-response_04-12-2017.pdf (last visited June 14, 2017).
[40] EPA, Steam Electric Power Generating Effluent Guidelines - Petitions for Reconsideration (2017),  *available at* https://www.epa.gov/eg/steam-electric-power-generating-effluent-guidelines-petitions-reconsideration ("EPA sent a letter to each state reminding them of flexibilities available to NPDES permitting authorities under the 2015 Steam Electric ELG Final Rule.") (last visited June 14, 2017).

41

consider petitioner's request for relief from the deadlines" in the ELG Rule.[41]  EPA sent letters

to the states, because, as explained above, *see supra* at 7-8, 10-11, the ELG Rule is implemented

by incorporating the Rule's requirements into a NPDES permit for each facility; and in the

overwhelming majority of states,[42] NPDES permits are issued by the state's environmental

agency, not by EPA.  The letters, in combination with the Indefinite Stay, are designed to slow

down, if not halt, implementation of the ELG Rule, particularly for indirect dischargers, which

face a compliance deadline of November 1, 2018, as well as for direct dischargers, which have a

compliance deadline of "as soon as possible" after November 1, 2018.[43]  EPA's actions have

increased the likelihood that state permitting authorities either will not reissue NPDES permits

until the uncertainty surrounding the ELG Rule is resolved or will reissue NPDES permits that

lack ELG Rule compliance deadlines.

Vacating the unlawful stay would not be sufficient to cure EPA's legal violations and to

remedy the harm to Plaintiffs from delaying implementation of the ELG Rule.  Specifically,

merely vacating the stay will not address the uncertainty among state permitting authorities and

regulated facilities regarding whether and how the ELG Rule's requirements should be

incorporated into permits for individual facilities.  If this Court vacates the Indefinite Stay but

does not require EPA to take additional steps to amend the public statements that it made prior to

issuing the Indefinite Stay, then states and utilities are unlikely to resume their efforts to comply

with the rule "as soon as possible" on or after November 1, 2018.  To fully remedy EPA's legal

violations and their disruptive effects on implementation of the ELG Rule, this Court should

---

[41] Letter from E. Scott Pruitt, EPA Administrator to Terry McAuliffe, Governor of Va., at 2 (Apr. 11, 2017), *available at* https://www.epa.gov/sites/production/files/2017-04/documents/steam-electric-elg_letter-to-va-mcauliffe_04-11-2017.pdf (last visited June 14, 2017).

[42] Forty-six states are authorized to issued NPDES permits.  *See* EPA, NPDES State Program Information, *available at* https://www.epa.gov/npdes/npdes-state-program-information (last visited June 14, 2017).

[43] *See* 40 C.F.R. § 423.16(e)–(i) (indirect dischargers); *id.* § 423.13(g)(1)(i), (h)(1)(i), (k)(1)(i) (direct dischargers).

vacate the Indefinite Stay and instruct EPA to send a letter to each state and to UWAG that: (1) informs the state of this Court's decision holding unlawful and vacating the Stay; and (2) reminds the state that, because the ELG Rule is in effect, the state must implement the Rule by incorporating its deadlines into NPDES permits.

A court in this district issued a remedial order containing similar instructions, where the agency had violated the APA, and other entities were involved in implementing the agency action at issue. In *Flaherty v. Pritzker*, the court found that federal agencies had violated the Magnuson-Stevens Act, the National Environmental Policy Act, and the APA based on a fisheries plan adopted by the New England Fishery Management Council. 17 F. Supp. 3d 52, 55 (D.D.C. 2014). "[T]he Remedial Order required Defendants to send a letter to the Council 'explaining the applicable law and National Standard 1 Guidelines relating to determining the stocks to be included in a fishery . . . . and recommending that the Council consider, in an amendment to the Atlantic Herring FMP, whether river herring should be designated as a stock in the fishery.'" *Id.* at 56. The agencies complied with the order and "sent such a letter to the Council on August 31, 2012." *Id.* Just as in *Flaherty*, the Court recognized the need for the defendants to send a letter explaining the law to another agency that adopted and implemented the rule at issue, so, too, should this Court order EPA to send to the state agencies that implement the ELG Rule a letter explaining that this Court has held that the Indefinite Stay is unlawful and that the ELG Rule is in effect and must be implemented.

Other courts have issued remedial orders with a similar goal of ensuring the agency's legal violations are fully cured. For example, after finding that a defendant agency had violated the Endandered Species Act, an Oregon district court required the defendant agency to provide a report to the court if it believed it could not, within the time frame set by the court, develop a

proposed action that would avoid jeopardizing species listed under the Endangered Species Act, and required the agency to consult with tribes and states during the remand.  *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, No. CV 01-640-RE, 2005 WL 2488447, at *5-6 (D. Or. Oct. 7, 2005).  Even though neither of these requirements appear in the Endangered Species Act itself, the Ninth Circuit Court of Appeals upheld the remedial order as reasonably tailored to cure the agency's legal violations.  *See Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 936 (9th Cir. 2008).  Similarly, after finding violations of the Total Maximum Daily Load ("TMDL") requirements of the Clean Water Act, a Washington district court required EPA to submit a report to the court on the adequacy of water quality monitoring and a schedule for development of TMDLs.  *Alaska Ctr. for the Env't v. Reilly*, 796 F. Supp. 1374, 1381 (W.D. Wash. 1992). This remedial order was also upheld by the Ninth Circuit as tailored to remedying EPA's violations of the Clean Water Act.  *Alaska Ctr. for Env't v. Browner*, 20 F.3d 981, 986–87 (9th Cir. 1994).

  In sum, the Court should vacate the Indefinite Stay, as vacatur is the normal remedy for a violation of the APA, particularly where, as here, EPA issued the Stay without providing prior notice and comment.  *See Allina Health Servs.*, 746 F.3d at 1110.  Vacating EPA's delay of requirements to eliminate, or reduce, toxic water pollution would promote the goals of the ELG Rule, and the Clean Water Act in general, to move toward eliminating water pollution and restoring the health of our nation's waterways, *see* 33 U.S.C. § 1251(a).  But vacatur alone will not cure EPA's unlawful effort to delay implementation of the ELG Rule by issuing the Indefinite Stay and sending letters to utilities and states urging that implementation be delayed as long as possible.  To fully cure EPA's unlawful delay of the ELG Rule, the Court should order EPA to send letters to UWAG and each state permitting authority that describe this Court's

44

holding that the Stay is unlawful and explain that the ELG Rule is in effect and must be implemented according to the Rule's terms.[44]

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court vacate the Indefinite Stay, published at 82 Fed. Reg. 19,005.  In addition, Plaintiffs request that the Court instruct EPA to send letters to UWAG and to each state's NPDES permitting authority informing the utilities and the states of this Court's decision and explain that the ELG Rule is in effect and must be implemented according to the terms of the Rule.

DATED:  June 14, 2017

/s/ Jennifer C. Chavez
Jennifer C. Chavez (D.C. Bar No. 493421)
Earthjustice
1625 Massachusetts Avenue NW, Suite 702
Washington, D.C. 20036
T: (202) 667-4500
E: jchavez@earthjustice.org

/s/ Thomas J. Cmar
Thomas J. Cmar (Illinois Bar No. 6298307) (pro hac vice)
Earthjustice
1101 Lake Street, Suite 405B
Oak Park, IL 60301
T: (312) 257-9338
E: tcmar@earthjustice.org

/s/ Matthew Gerhart
Matthew Gerhart (Washington Bar No. 42787) (pro hac vice)
3639 N Clayton Street
Denver, CO 80205
T: (510) 847-7721
E: megerhart@gmail.com

---

[44] Although at this time Plaintiffs are not seeking any equitable relief beyond an order from the Court directing EPA to correct its prior letters to states and utilities, Plaintiffs reserve the right to seek further equitable relief from the Court in the future, including injunctive relief, if necessary to cure the harm of EPA's unlawful action and ensure that EPA reinstates the ELG Rule's compliance deadlines.

*Counsel for Plaintiffs Clean Water Action, Sierra Club,*
*and Waterkeeper Alliance, Inc.*

*/s/ Casey Austin Roberts*
Casey Austin Roberts (California Bar. No. 253474) (*pro hac vice*)
Sierra Club
Environmental Law Program
1536 Wynkoop Street, Suite 312
Denver, CO 80202
T: (303) 454-3355
E: casey.roberts@sierraclub.org

*/s/ Joshua Smith*
Joshua Smith (Florida Bar No. 0096844) (*pro hac vice*)
Sierra Club
Environmental Law Program
2101 Webster Street, Suite 1300
Oakland, CA 94612
T: (415) 977-5560
E: joshua.smith@sierraclub.org

*Counsel for Plaintiff Sierra Club*

*/s/ Abel Russ*
Abel Russ (D.C. Bar No. 1007020)
Environmental Integrity Project
1000 Vermont Avenue NW, Suite 1100
Washington, DC 20005
T: (802) 482-5379
E: aruss@environmentalintegrity.org

*/s/ Lisa Widawsky Hallowell*
Lisa Widawsky Hallowell (Pennsylvania Bar No. 207983) (*pro hac vice*)
Environmental Integrity Project
509 Vine Street, Apt. 2A
Philadelphia, PA 19106
T: (202) 294-3282
E: lhallowell@environmentalintegrity.org

*Counsel for Plaintiffs Environmental Integrity Project,*
*PennEnvironment, Inc., Chesapeake Climate Action Network,*
*Physicians for Social Responsibility, Chesapeake, Inc., and Prairie*
*Rivers Network*

46